THE STATE v. ROBINSON, *Appellant.*

Division Two, November 9, 1893.

1. **Criminal Practice:** JUROR: NEWSPAPER REPORTS OF EVIDENCE. While one is incompetent to serve as a juror on a trial for murder, who has read and formed an opinion from an accurate newspaper publication of the evidence as taken at the coroner's inquest, yet the rule does not apply where the evidence, so read, only "purported to be" the evidence taken at the inquest.

2. ——: EVIDENCE: CONFESSION: WAIVER. It is too late to object for the first time in the motion for a new trial, or on appeal, to the introduction in evidence of a confession of the defendant.

3. ——: ——: ——. A confession by defendant *held* to have been made under circumstances authorizing its admission in evidence.

4. ——: REASONABLE DOUBT: INSTRUCTION. An instruction to the jury that "if you have a reasonable doubt of defendant's guilt you should acquit, but a doubt to authorize an acquittal on that ground ought to be a substantial doubt touching defendant's guilt, and not a mere possibility of innocence," is a sufficient instruction on the question of reasonable doubt. (*Following State v. Nueslein,* 25 Mo. 111.)

5. ——: CIRCUMSTANTIAL EVIDENCE: INSTRUCTION. An instruction founded on the theory that the prosecution relied solely on circumstantial evidence is properly refused, where, in addition to the circumstantial evidence, there is in evidence a confession by defendant of his guilt.

6. ——: DEFENDANT NOT TESTIFYING: INSTRUCTION. Revised Statutes 1889, sec. 4219, providing that the failure of defendant to testify shall not be referred to by any attorney in the case, or be considered by the court or jury before whom the trial takes place, does not warrant an instruction asked by defendant that his failure to testify shall not create any presumption against him.

7. ——: BLOOD STAINS: NON-EXPERT WITNESS. A non-expert witness is competent to testify that stains on a coat looked like blood.

8. ——: EXCLUDING EVIDENCE. Where evidence is improvidently admitted, though without objection, it may be stricken out on motion or be excluded by an instruction.

9. ———: EVIDENCE: `DEFENDANT'S FALSE STATEMENTS. False state-
ments of persons accused of crime, about matters which are likely to
lead to their detection, are admissible in evidence against them.

10. Criminal Law: MURDER IN FIRST DEGREE: VERDICT. The verdict
of murder in the first degree in this case *held* to be supported by the
evidence.

11. Criminal Practice: JUROR TAKING NOTES: NEW TRIAL. A motion
for a new trial for the reason that a juror took notes of the evidence
during the trial, is properly overruled where it does not affirmatively
appear that defendant had no knowledge of such fact before the jury
retired to consider their verdict.

12. ———: JUROR: IMPEACHMENT OF VERDICT. The affidavit or state-
ment of a juror cannot be received to impeach his verdict.

*Appeal from Pettis Criminal Court.*—HON. J. E. RYLAND,
Judge.

AFFIRMED.

THE defendant, a negro, was convicted of murder
in the first degree, the charge being that he killed
Johanna Schollman, a white girl, by stabbing her with
a knife.

In substance, the salient facts developed at the
trial are these: The deceased was employed as a
domestic in the family of Mayor Stevens, of Sedalia.
The defendant was also in the employ of Mayor
Stevens, and slept in a room at the barn. On the
evening of October 24, 1892, which was Sunday, the
deceased left Mayor Stevens' house and went to Mr.
Miller's, a place she was accustomed to visit, which was
on the corner of Grand avenue and Twenty-fifth street.
She arrived there between six and seven o'clock, having
in her hand a little bundle which she said contained
her night gown. She took supper there; said she
expected some one to call for her, and that she was
going out to see relatives next day in Benton county.
She seemed to feel uneasy. Pretty soon the one who
was to come for her came, and called out her name at

the door, (who it was Mrs. Miller did not know) and she got into a buggy with the unknown man whom Mrs. Miller did not see, and rode off with him; this was about seven o'clock. At ten o'clock on the same evening, some unknown person called at Miller's for deceased, by calling her name at the door, but no one responded to this call.

A little after seven o'clock the defendant obtained a buggy from Field's livery stable, drove off in a few minutes, and about nine o'clock, when he returned the buggy, the horse was cool, did not seem to have been driven hard nor far, and though the streets were muddy that afternoon, the horse was not muddy. When defendant returned the buggy, he left therein a bundle, of which more hereafter. About eleven o'clock that night defendant returned to Mayor Stevens' barn, where he slept. Another negro, Swepstone, was in the bed, having arrived something like half an hour before. When defendant came in he lit his pipe and sat there smoking, but when he went to bed, his companion, who meanwhile had fallen asleep, did not know. Defendant was in bed, however, the next morning, and got up by six o'clock and started out on horse back and came back from town bringing a piece of meat for the family and took it to the house. That morning early he had also called by Field's livery stable and asked for a small bundle which he said he had left in the buggy the night before. This being given him, he rode off with it.

On that same morning, Monday, October 25, at an early hour, the body of deceased was discovered near the corner of Seventeenth and Moniteau streets. The deceased had apparently received the fatal wound which was a puncture of the interior jugular vein on the left side of the neck, and she had apparently been dragged by the heels, as shown by the disarranged

condition of her clothing and the depression of the
weeds, from that place which gave indications of a
struggle, some sixty feet to where she was found on
her back at the corner of the hedge.    On her right jaw
there was a well marked bruise of some kind.    The
punctured wound had the appearance of having been
made by a pen knife.    Dr. Muehl, the coroner, said:
"I saw some marks where the body was lying and
others in the vicinity; I saw a path where the body had
been dragged, then went back to where originally the
struggle evidently took place, at the southwest corner
of the lot of the hedge there on Moniteau street and
there was a clot of blood there where the woman had
probably been knocked down there and dragged to
the place where we found her.    This trail was con-
tinuous from where it had taken place to where she
was, the blood had come from the wound, for the side
of the face and neck was also covered with blood which
came from the wound itself, and there was more or
less hemorrhage from the nostrils from the blow or
shock."    On the hedge and on the weeds there were
bits of fur which were identical with that on the
jacket of deceased, and which could be easily traced
along the path where the body had apparently been
dragged.    A knife was also found in the field inside
the hedge, and on the open blade of the knife was
blood, and fur precisely like that with which the cloak
of deceased was trimmed.    The sexual organs gave
tokens, as testified by one of the physicians, that an
outrage had perhaps been perpetrated on the deceased
prior to her death.    One of the witnesses thought that
the body of the deceased had been brought from a dis-
tance and then dumped down where found, but the
other witnesses thought as did Dr. Muehl.    That
physician also stated that in case of a punctured
wound, such as borne by deceased, that the blood does .

not spurt out, but seeps, goes slowly, and that it might take several hours between receiving such a punctured wound and the occurrence of death. He was also of opinion that the deceased had been dead four or five hours, though he admitted it might have been longer; could not say exactly. He saw the body between eight and nine o'clock in the morning. Dr. Muehl also stated that he did not think that loss of blood alone produced the death of the deceased, but was also caused by the blow, the shock, hemorrhage and fright.

There was also testimony in behalf of defendant, to the effect that deceased was seen between seven and nine o'clock on the evening of the twenty-fourth of October with a white man in a restaurant at Sedalia, and that defendant came into DeJarnett's restaurant in that city about nine o'clock that evening and bought a piece of chicken.

Suspicion was directed towards defendant by testimony elicited at the coroner's inquest and defendant was arrested and committed to the Pettis county jail. While there, Hyatt having been present at that inquest, asked defendant what had become of the bundle which defendant had left in the buggy, and he told Hyatt that it was only some tobacco which he had bought of Gottschalk that Sunday evening, just after he got into the buggy he had hired of Field. Asked by Hyatt what he had done with the overcoat he had worn that evening, describing it, he answered he did not wear such an overcoat, but that he wore a brown overcoat trimmed with fur which Hyatt would find behind the door in his room, which Hyatt did; but on looking between the mattresses of defendant's bed, he found the light overcoat which he had described to defendant, and which was abundantly shown to have been defendant's, hidden between the mattresses on

defendant's bed, and spotted with what appeared to be fresh blood stains. On Tuesday after the homicide, Oliver, working for Mayor Stevens, found under a manure pile at the south side of the barn, a night gown, pocket comb and pocket book shown to be those of the deceased girl. Gottschalk testified that he never sold defendant any tobacco on the Sunday evening mentioned, and never kept his store open of a Sunday. Several witnesses testified to defendant's being in the vicinity of where the crime was committed on the night of its commission.

Shortly after defendant's being incarcerated in jail, the sheriff became alarmed at the threats of mob violence, and so he spirited defendant away on a midnight train and took him to California. Defendant was aware of the reason for which he was being taken away at that time and seemed nervous and frightened. On the way down there, the sheriff got into conversation with defendant during which he said to him: "Dick we want to know the facts in this case; it will be better to tell the truth about this matter; I think it will be a relief to you if you will simply state them, and relieve your mind and conscience of them." And the sheriff further stated to him, "Whatever you say to me will probably be used against you in evidence." But defendant declined to make any statement then; but he told the sheriff that "if he would come back the next day or later, that he would talk to him about the matter mentioned, that he didn't feel like talking that night," etc. On the next day the sheriff returned and defendant was told that some things had been found in Stevens' barn which might be used as evidence in the case, and he was again warned by the sheriff that any statement he might make, etc. Thereupon defendant made the following confession

which, being reduced to writing, was signed by him, which was read in evidence.

CALIFORNIA, Mo., October 26, 1892.

Hannah Schollman left Mr. Stevens' house about five o'clock Sunday eve last to go to Mr. Miller's, on corner of Wilkerson and Grand Avenue. The next time I seen her I met her on the north side of street near Prospect school house about 8:30 P. M., we walked together from Second to Grand Avenue, from there to Broadway, then to Moniteau, then direct south to Hunnefelts', and stopped at gate and talked? She quarreled with me about Taylor Williams, she said she had a notion to cut my throat, she drew a knife to cut my throat and I knocked her down with my fist; she got up on her feet, and she struck at me with the knife and I grabbed the knife and I knocked her down the second time; she said 'you son of a bitch, I am going to kill you, or I will have it done;' she got up again and I threw her down and sat down by her side; I said 'Hannah, what do you mean?' she said, 'one of us has got to die tonight,' I told her to go into the house (that is her uncle's house). I gave her back the knife on the south side of the hedge near middle of the street, I then started to go home, she said 'if you will come back I will behave myself and go into the house, I just want to speak to you one minute,' I went back to her again, and she made a break with the knife. I grabbed her, said, 'Hannah you had better quit, I ain't going to run from you any more,' she said, 'one of us has got to die; if you don't kill me I will kill you,' she got the knife fastened so she could not get to use it on me, I took the knife away from her, and said 'Hannah, that if one of us has got to die,' I said 'I just as well be hung for you, as you for me;' I then struck her in the throat with the knife, she fell at my feet but did not say a word. This took place at the corner of the

hedge about 10 o'clock that night. After she had fallen, I stooped down and said to her 'Hannah,' she did not answer, I thought I had cut her wind pipe, as she did not not answer me, she lay there about five minutes, and then I drug her by catching hold of her just above her knees and drug her about thirty feet east from where I killed her. I then threw the knife into the hedge fence, I then left her lying on the ground, and come home by coming down Moniteau to Broadway, then to Grand Avenue to Wilkerson, then to Quincy, then home, Stevens' stable. I had been down during the next day (Monday) and heard the people talking and I concluded I had better hide the bundle (that is to say the comb and gown and pocket book) in the manure pile south of Stevens' barn. All the money I had that Sunday eve and up to the time I was arrested was $2.20. I did not get a $5 bill changed, nor did I offer a $5 bill to the liveryman to pay for the buggy and horse. We never were criminally intimate; if she was a bad girl I did not know it. I got the buggy to take Francis Williams out riding, but she would not go. Francis lives north of Pacific railway. The above and foregoing is as true a statement as I can make.

"Witness this signature         His

"JOHN J. KINNEY.         DICK X ROBINSON.
                                       mark."

The defendant established a good character as a peaceable and law-abiding citizen, etc. Any matters omitted in this statement will be adverted to in the opinion of the court.

*D. E. Kennedy* for appellant.

(1) The verdict is not supported by the evidence. (2) The court erred in refusing instructions asked by defendant. (3) The testimony of sheriff Smith, was

not admissible; the testimony of a witness to prove a confession is inadmissible if he does not remember the substance of what was said to him. *Berry v. Com.* 15 S. E. Rep. (Ky.) 272; *People v. Gilbert*, 39 Cal. 272; *Westmoreland v. State*, 45 Ga. 225. (4) The court erred in admitting as testimony the confession of defendant. *Smith v. State*, 15 S. E. Rep. 675; Kerr on Homicide, sec. 479; 3 Russell on Crimes, 367; 3 American and English Encyclopedia of Law, 439 to 496; *State v. Walker*, 68 Mo. 95; *State v. Hagan*, 54 Mo. 192; *State v Brockman*, 46 Mo. 566; *State v. Jones*, 54 Mo. 526; *State v. Hopkirk*, 84 Mo. 278; *Conley v. State*, 12 Mo. 462. (5) The court erred in overruling defendant's motion to quash the indictment. *State v. Herrell*, 92 Mo. 105. (6) The defendant contends that the juror, Freeman H. Glass, was guilty of such misconduct as would vitiate the verdict by taking notes of the testimony during the progress of the trial. This was clearly a reversible error. Thompson on Trials, secs. 2585 and 2619; *Cheek v. State*, 35 Ind. 492–495. (7) The court erred in overruling defendant's challenges to the jurors who stated that they had read the confession of the defendant, from which they formed opinions, and several of the said jurors went on the panel of forty with the same opinion, formed from reading the evidence as stated. This absolutely disqualified them. Defendant was entitled to forty jurors who were unbiased by any opinion based upon testimony or evidence. Revised Statutes 1889, sec. 4200; *State v. Culler*, 82 Mo. 625; *Com. v. Knapp*, 20 Am. Dec. (Mass.) 491; *State v. Hultz*, 106 Mo. 41; *State v. Walton*, 74 Mo. 270.

*R. F. Walker*, Attorney General, for the state.

(1) The instructions given by the court fully present all the issues to the jury. (2) The testimony of

sheriff Smith, was clearly admissible; nor did the court commit error in permitting the state to establish by Charles Gottschalk, the presence of defendant near the place where the crime was committed on the same evening. (3) The written admission and confession of the defendant was not made under any inducement, influence or threat, but was made voluntarily by him, two days after his removal from the Pettis county jail, according to an arrangement made by him with the sheriff and Kinney. No inducements were held out to him nor threats made. He was not influenced through fear of any violence, hence, it was clearly admissible, and the court committed no error in permitting it to go to the jury. *State v. Ware*, 62 Mo. 597; *State v. Patterson*, 73 Mo. 695; *State v. Fredricks*, 85 Mo. 145. (4) Nor should the cause be reversed because of alleged misconduct of juror Glass. This question was submitted to the trial judge upon the affidavit of Mr. Kennedy, who affirms that juror Glass told him that, during the trial he took notes in writing of the testimony, which Mr. Ramsey, the deputy sheriff in charge of the jury, and Mr. Hoffman, the prosecuting attorney, who were present during the trial of the cause, deny and say that they did not see juror Glass take any notes of the testimony. The trial judge, in his discretion, determined this question against the appellant, which finding should not be disturbed unless it clearly appears that his discretion has been abused. (5) No error was committed by the trial court in overruling the defendant's challenge to the jurors, Henderson, Crume, Downs, Chryst, Anderson, Gray and Mason; upon their examination they stated they had formed an opinion from the newspaper accounts, but that such opinion would not prevent them from giving the defendant a fair and impartial trial. This was all that was required, and rendered them competent as jurors,

*State v. Cunningham*, 100 Mo. 382; *State v. Brooks*, 92 Mo. 542.

SHERWOOD, J.—Numerous errors are assigned as grounds for reversal of the judgment, which will now be considered.

I. And first as to the objection that certain incompetent jurors were placed on the list and on the panel that afterwards tried defendant. In *State v. Hultz*, 106 Mo. 41, a juror was ruled incompetent who had heard the witnesses testify at a preliminary examination, and had read a report of the evidence in a local newspaper. In the present instance the jurors in question had read in local newspapers what "purported to be" the evidence taken at the coroner's inquest, and what "purported to be" the confession made by defendant to the sheriff.

Our statute touching the qualification of jurors is contained in section 4197: "It shall be a good cause of challenge to a juror that he has formed or delivered an opinion on the issue, or any material fact to be tried, but if it appear that such opinion is founded only on rumor and newspaper reports, and not such as to prejudice or bias the mind of the juror, he may be sworn." This statute is short, plain and easily obeyed: *First.* If the juror has formed or delivered an opinion, the statute disqualifies him; but, *second*, if such opinion be "founded only on rumor or newspaper reports," he is not disqualified, provided his opinion "is not such as to prejudice or bias the mind of the juror."

In *Bryant's case*, 93 Mo. 273, the jurors challenged had read "the report of the testimony of the former trial as published in the newspapers mentioned, and substantially as contained" in that record. When this is the case, it seems quite clear that a proposed juror would be incompetent; for surely no well founded dis-

tinction can be taken between being present when testimony is delivered orally in a cause, and reading the same testimony taken down and accurately published in some newspaper; in a word, there is no difference between the *hearing ear and the seeing eye*. This view is fully sustained by *State v. Culler*, 82 Mo., 623, where it was ruled that one who had read as originally written or printed in a newspaper the evidence taken before the coroner and formed an opinion therefrom is disqualified from serving as a juror in that cause. Other authorities holding the same view will be found in *Bryant's case, supra, loc. cit.* 284 *et seq.*

But the trouble in the case at bar is that it is not made to appear that the reports read in the local papers, were either a literal or a substantial report of the confession of the defendant as contained in the present record. This being the case, such printed statements must be regarded simply as "rumors and newspaper reports," and as the jurors said they were without bias or prejudice, they were competent under the statute already quoted, and hence objections to them were not well taken.

II. There was no objection made or exception saved to the introduction of the confession of the defendant in evidence, and it was too late to raise the point in the motion for a new trial, or in this court. Aside from this, the testimony already given shows in a very clear manner that the confession was properly admitted and was taken in circumstances fully authorized by the following authorities: *State v. Patterson*, 73 Mo. 695; *State v. Phelps*, 74 Mo. 128; *State v. Hopkirk*, 84 Mo. 278. We reaffirm the principles therein announced.

III. The instructions given on behalf of the state, were in usual form as to murder in the first and second degrees; confession made by defendant; good charac-

ter of defendant and as to reasonable doubt. The instruction on the last topic is in substantially the same form as was approved in *State v. Nueslein,* 25 Mo. 111, and that form of instruction has been generally followed since then. It is urged that the jury should have been told what a reasonable doubt was, and that it should have been explained to them. But this was unnecessary. It is difficult to explain simple terms like "reasonable doubt," so as to make them plainer; 1 Bishop on Criminal Procedure, sec. 1094. Every attempt to explain them renders an explanation of the explanation necessary.

On the part of defendant were given the following instructions:

"1. The jury are instructed that the law clothes the defendant with the presumption of innocence which attends and protects him until it is overcome by testimony which proves his guilt beyond a reasonable doubt, which means that the evidence of his guilt as charged, must be clear, positive and abiding, fully satisfying the minds and consciences of the jury. It is not sufficient in a criminal case to justify a verdict of guilty that there may be strong suspicions or even strong probabilities of guilt, but the law requires proof by legal and credible evidence of such a nature, that when it is all considered, it produces a clear, undoubting and entirely satisfactory conviction of defendant's guilt. And the burden of establishing the guilt of the defendant as above required is on the prosecution.

"2. The jury are instructed, that when the evidence fails to show any motive to commit the crime charged, on the part of the accused, this is a circumstance in favor of his innocence. And in this case, if the jury find upon careful examination of all the evidence, that it fails to show any motive, on the part of the accused, to commit the crime charged against him,

then this is a circumstance which the jury ought to consider in connection with all the other evidence in the case, in making up their verdict.

"3. The jury are further instructed, that the indictment in this case is of itself a mere accusation or charge against the defendant, and is not of itself any evidence of the defendant's guilt; and no juror in this case should permit himself to be, to any extent, influenced against the defendant because or on account of the indictment in the case.

"4. The court further instructs the jury, that in this case the law does not require the defendant to prove himself innocent, but the law imposes upon the prosecution, to prove that the defendant is guilty in manner and form as charged in the indictment, to the satisfaction of the jury, beyond reasonable doubt; and unless they have done so, the jury should find the defendant not guilty.

"5. The jury are instructed further that the presumption of innocence is not a mere form, to be disregarded by the jury at pleasure, but it is an essential, substantial part of the law of the land, and binding on the jury in this case; and it is the duty of the jury to give the defendant in this case the full benefit of this presumption and to acquit him, unless they feel compelled to find him guilty as charged by the law, and the evidence in the case convincing them of his guilt as charged beyond reasonable doubt.

"6. The jury are instructed that they are the sole judges of the credibility of the witnesses, and of the weight to be given to their testimony. In determining such credibility and weight, you will take into consideration the character of the witness, his manner on the stand, his interest, if any, in the result of the trial, his relation to or feelings towards the defendant or the deceased, the probability or improbability of his state-

ments as well as the facts and circumstances given in evidence. In this connection you are further instructed that if you believe that any witness has knowingly sworn falsely to any material fact, you are at liberty to reject all, or any portion of such witness' testimony.''

Considering these instructions in connection with those given on behalf of the state, they set the matters for investigation before the jury in a fair light.

IV. It is claimed that an instruction should have been given similar to the one approved in *Moxley's case*, 102 Mo. 374, to the effect that where the prosecution relies on circumstantial evidence *alone*, that then, etc., etc., *Ib. loc. cit.* 388. Such an instruction was inapplicable to the facts in this case, because here although there was some circumstantial evidence which strongly corroborated the confession of defendant, yet the latter was positive testimony, a solemn admission by the defendant of his guilt. As to whether he made that confession was solely the province of the jurors to determine.

V. Another instruction it is said the court ought to have given, and that was to the effect that if a party accused fail to testify, that such failure shall not create any presumption against him. There was no error in refusing such an instruction. Section 4219, Revised Statutes, 1889, is the one relied on to sustain this view; but the concluding words of that section provide that such failure to testify shall not ''be referred to by any attorney in the case, nor be considered by the court or jury before whom the trial takes place.'' If the court had given such an instruction, it would have disobeyed the *spirit* if not the letter of the law.

VI. It is assigned as error that the court permitted Hyatt to testify that there were blood stains on defendant's overcoat, when he found it between the mattresses on defendant's bed. There was no objection made by

defendant's counsel to the introduction of this evidence. Besides, Hyatt of his own volition qualified his first statement by saying "they are  *  *  *  what I would have taken to be blood when I seen them." It was not necessary for Hyatt to be an expert in order to testify what the stains on the overcoat "looked like." Frequently the opinion of a witness as to the appearance of an object he has seen is the best and only evidence attainable; nevertheless, it is competent. *State v. Parker*, 96 Mo. *loc. cit.* 393, and cases cited. Because Hyatt was not an expert, defendant's counsel moved the court that the latter portion of his testimony, just mentioned, be stricken out.

There is no doubt that the rule is that where evidence is improvidently admitted, though without objection, that such evidence may be excluded by an instruction, or stricken out on motion. Two cases in this court attest the correctness of this position. *State v. Cox*, 65 Mo. *loc. cit.* 32; *State v. Owens*, 79 Mo. *loc. cit.* 631. This is the prevailing rule elsewhere. 2 Thompson on Trials, sec. 2354. But notwithstanding this, the ruling of the trial court in denying defendant's motion was correct for reasons already stated.

VII. It is likewise assigned as error that Gottschalk was permitted to testify as he did, that he did not sell defendant any tobacco on Sunday evening, nor did he keep his store open on Sundays. There was no error in this ruling. The telling of falsehood by persons suspected of crime about matters which are likely to lead to their detection is always competent. It shows their guilty fears and thus tends to show that their apprehensions have some foundation. Such fabrications are common amongst criminals, who thus seek to divert suspicion from themselves. *State v. Dickson*, 78 Mo. *loc. cit.* 449, and cases cited; Wharton's Criminal Evidence [9 Ed.], sec. 751, and cases cited.

VIII. It is urged that the verdict is unsupported by or against the evidence. This seems a singular position when considering the confession made by defendant, as well as the very cogent corroborating circumstances heretofore related. It is true that Dr. Small states as his opinion that the deceased was not stabbed at or near the place where she was found, and that she was not dragged there, and he was also of opinion that the wound in her neck was inflicted after death, and yet he says he *did not see the wound.* He bases this opinion on the small amount of blood found on the ground at the locality where the body lay, but he admits that the flow of blood from such a wound would not be large, if "she (deceased) had too much of a shock." But, however, this may, it belonged to the jury to say which theory they adopted and regarded as supported by the facts; this they have done by their verdict.

IX. It is also contended that the verdict of the jury is against the evidence and the instructions of the court, for the reason that, even taking the confession of defendant as true, it lacks any evidence of *deliberation.* This claim is without foundation; the facts set forth in that confession show a deliberate killing with a deadly weapon, after an express declaration of an intention to kill, and this without apparent provocation or necessity. Wharton on Criminal Evidence [9 Ed.], secs. 736, 764; 1 Wharton on Criminal Law, sec. 381.

X. The last point for determination is whether the verdict was vitiated in consequence of juror Freeman A. Glass having taken notes of the testimony during the progress of the trial; it is contended that it was. This point will be considered in several ways.

*First.* In the first place, in some of the states, statutory provisions sanction the taking of notes by jurors during the trial. 2 Thompson on Trials, secs. 2595 *et seq.*

*Second.* In the second place the authorities are divergent as to whether the taking of notes by a juror is such an act as has the prejudicial effect here claimed for it. 2 Thompson on Trials, sec. 2585, and cases cited.

*Third.* In the third place, where misbehavior of a juror is charged as having occurred during the trial, it must *affirmatively* appear that the party complaining thereof did not know of the fact before the jury retired to consider of their verdict. 2 Thompson on Trials, sec. 2620, and cases cited. This material fact is not disclosed in the affidavit filed, and the statement of it in the motion for a new trial is no evidence of its existence, as all our authorities show. If the complaining party knew during the trial of such misbehavior, it was his duty to call immediate attention of the court to it, and not take his chances of a reversal based on such ground.

*Fourth.* In the fourth place, under our rulings, the affidavit or testimony of a juror is not received to gainsay or impeach his verdict. Of course, what a juror can not do directly, he can not do indirectly. The statement, therefore, in the affidavit of counsel, that the juror had stated since the trial that he took notes of the testimony while it was in progress, is wholly inadmissible for the reason stated and for the additional reason that such statement would be but the most pronounced hearsay. 2 Thompson on Trials, sec. 2622. For these reasons there was no error in overruling the motion for a new trial based on the ground just considered.

Finding no error in the record, we affirm the judgment and direct the sentence pronounced to be executed. *State v. Pagels,* 92 Mo. *loc. cit.* 317; Revised Statutes, 1889, sec. 4298. All concur.