# CASES DETERMINED

BY THE

# SUPREME COURT

OF THE

## STATE OF MISSOURI

AT THE ·

### OCTOBER TERM, 1910.

*(Continued from Volume 231)*

## THE STATE v. EUGENE TUCKER, Appellant.

**Division Two, December 27, 1910.**

1. **INSTRUCTIONS: On Whole Law of Case.** Where defendant did not request any instructions, and after the court had given its instructions did not request it to instruct on any other view of the law, and did not save any exception to the failure to instruct on all the law applicable to the facts, he cannot on appeal complain that the court failed to instruct the jury on the whole law applicable to the facts in evidence.

2. ————: **Heat of Passion: Provocation.** An instruction telling the jury that in order to reduce the killing from murder in the first degree to murder in the second degree, it must have been done in a heat of passion caused by some act or conduct of deceased, such as would reasonably cause passion on the part of defendant, and the fact that deceased's husband took up and impounded defendant's cattle and refused to deliver them up on demand, was not sufficient legal provocation to reduce the killing from murder in the first degree to murder in the second degree, is not reversible error, where there was no evidence whatever of any provocation on the part of defendant.

3. ————: ————: ————: No Evidence: Incorrect Instruction. Where there is no provocation, the fact that the court may err in its definition of what constitutes provocation will furnish no ground for a reversal. And where defendant testified that he did not see deceased at the time he shot at her husband and never intended to kill her, and there could therefore have been no provocation to kill her, an instruction erroneously defining provocation as it related to her husband is not reversible error, if the court correctly instructed for murder in the second degree.

4. JURY: Misconduct: Separation: Not Timely Assigned. Where the jury the first night of the trial were kept in the office of the jail for a few hours, and during that time some of them were taken by the sheriff through the corridors about the cages in which prisoners were confined and there was no communication with the prisoners or other person, and the separation of the jury is not made a ground for a new trial in the motion and no showing is made of the time when knowledge of such alleged separation came to defendant or his attorney, an assignment that error was committed in permitting the jury to separate is not for review on appeal.

5. ————: Coercing Verdict: Remarks of Judge. The trial judge cannot invade the province of the jury; nor can he coerce a verdict by threatening, even indirectly, to keep them together until they agree. On the morning following the retirement of the jury the previous afternoon, the trial judge made these remarks to them: "Gentlemen, if this case is ever decided it will have to be decided by twelve men. You are all intelligent, fair-minded men, and if you fail to agree where can a jury be found that can agree? While it is not within the province of the court to try to force you to an agreement, and while I would not ask or suggest that any juryman ought to agree to a verdict that would not meet the approval of his conscience, still I feel that you ought not to be discharged until you have deliberated further, and made further endeavor to reach a verdict." Two hours thereafter the jury returned a verdict finding defendant guilty of murder in the first degree, and fixing his punishment at death. Held, that the remarks contain no intimation of a desire to attempt to coerce a verdict, and were not error.

6. ————: Challenge. A mere challenge of a juror on his voir dire examination is not sufficient. The ground of the challenge should be stated.

Appeal from Greene Criminal Court.—*Hon. Alfred Page*, Judge.

AFFIRMED.

*Perry T. Allen* for appellant; *Patterson & Patterson* of counsel.

(1) The court erred in not instructing the jury on the whole law applicable to the case made by the evidence. State v. Heinze, 66 Mo. App. 135; State v. McGuire, 113 Mo. 670; State v. Nelson, 118 Mo. 124; State v. Branstetter, 65 Mo. 149; State v. Banks, 73 Mo. 592; State v. Patrick, 107 Mo. 147; State v. Stonum, 62 Mo. 596; State v. Palmer, 88 Mo. 568; State v. Jones, 61 Mo. 232; State v. Taylor, 118 Mo. 153; State v. Rufus, 149 Mo. 406. Where the defendant testifies in a criminal case instructions predicated upon his evidence should be given. State v. Anderson, 86 Mo. 309; State v. Talmage, 107 Mo. 543; State v. Palmer, 88 Mo. 568; State v. Anderson, 86 Mo. 309. If the deceased was not the aggressor but had called the defendant a liar, and defendant, incensed at the insult, but without lawful provocation, willfully and intentionally shot deceased, he is guilty of murder in the second degree. State v. Gleason, 172 Mo. 259; State v. McKenzie, 177 Mo. 699; State v. McMullin, 170 Mo. 608. Insulting or opprobrious epithets may arouse the passion to such an extent that if the person to whom they are applied, acting under the heat of passion engendered thereby, kills his adversary, such provocation will reduce the killing to murder in the second degree, but they do not amount to a justification of the killing of the party who uses them. State v. Ballance, 207 Mo. 619; State v. Gartrell, 171 Mo. 516; State v. Gordon, 191 Mo. 125. The court, in a trial for murder in the first degree should define the meaning of the term "heat of passion," and should also explain to the jury the character of the "heat of passion" which will reduce the homicide to murder in the second degree and manslaughter, where the evidence authorizes instructions on such grades of homicide. State v. McKinzie, 102 Mo. 620; State v. Bulling, 105 Mo. 204; State v. McKenzie, 177 Mo. 711. The term deliberation comprehends and includes the

term "heat of passion" or hot blood. The term deliberation should have been defined with explicitness and precision. The trial court nowhere in any of its instructions so defines the term deliberation. The court in order to have instructed on the whole law applicable to the case made by the evidence should have instructed the jury that if the defendant shot and killed the deceased while he, the defendant, was in a violent passion suddenly aroused by opprobrious epithets or abusive language, then such killing was not deliberate and was not murder in the first degree. State v. Ballance, 207 Mo. 617; State v. Gartrell, 171 Mo. 515. (2) The court erred in giving instruction 6. The instruction is subject to criticism because it begins with a vague and ambiguous definition of deliberation and of "heat of passion." The instruction is unfair, improper, and erroneous because it ends by singling out, commenting upon, and giving special prominence to the fact that deceased had taken up defendant's cattle and refused to deliver them to the defendant on demand therefor, and directing the jury that such refusal was not sufficient provocation to reduce the killing from murder in the first to murder in the second degree. The action of the court in directing the jury that the impounding of defendant's cattle and the refusal to deliver them on demand was not sufficient provocation for the heat of passion that destroys deliberation, was improper, because a usurpation by the court of the jury's function of finding the facts. State v. Grugin, 147 Mo. 39. This court has held times without number that insulting epithets were sufficient provocation to reduce the grade of the homicide from murder in the first to murder in the second degree. State v. Gleason, 172 Mo. 259; State v. McKenzie, 177 Mo. 699; State v. McMullin, 170 Mo. 608; State v. Ballance, 207 Mo. 607. If insulting and opprobrious epithets are sufficient provocation to reduce the grade of the killing from murder in the first to murder in the second de-

gree, why would not the unlawful refusal of deceased to deliver defendant's cattle to him upon demand, and an offer to pay such damage as deceased claimed, be sufficient provocation to create the heat of passion that would reduce the killing to murder in the second degree? Whether the state of mind necessary to make the killing the lowest grade of murder was in fact superinduced by such provocation, and whether it actually existed at the time of the killing are questions of fact for the jury. State v. Ellis, 74 Mo. 207. (3) The court erred in giving instruction 7, which is as follows: "If you believe from the evidence that the defendant intentionally shot and killed Elizabeth Ellis, then you are instructed that there is no evidence of such provocation as would reduce such intentional killing of the said Elizabeth Ellis from murder in the first to murder in the second degree." The vice of this instruction is that it eliminates every element of murder in the first degree except that of willfulness, eliminates the element of premeditation, malice aforethought, and deliberation, and tells the jury in plain terms that an intentional killing is murder in the first degree. To constitute murder in the first degree, the elements of willfulness, deliberation, premeditation, and malice aforethought must all exist. State v. Holme, 54 Mo. 153; State v. Silk, 145 Mo. 240; State v. Gassert, 65 Mo. 352; State v. Frazier, 137 Mo. 317; State v. Fitzgerald, 130 Mo. 470; State v. Harris, 76 Mo. 361; State v. Anderson, 98 Mo. 461; State v. Underwood, 57 Mo. 40. The law presumes, in the absence of evidence to the contrary, that an intentional killing with a deadly weapon is murder in the second degree. And it devolves upon the defendant to adduce evidence to repel that presumption, unless it is repelled by evidence introduced on the part of the State. State v. Elliott, 98 Mo. 150; State v. Bowles, 146 Mo. 6; State v. Minor, 193 Mo. 597; State v. Silk, 145 Mo. 240; State v. Williams, 69 Mo. 110; State v. Young, 119 Mo. 495.

Whether such a killing is deliberate and premeditated or not is a question for the jury and cannot be determined as a matter of law by the court. State v. Williams, 69 Mo. 110. A homicide though willful is not murder in the first degree unless committed with deliberation. State v. Hill, 69 Mo. 451. And an instruction is fatally defective which assumes that there can be murder in the first degree without deliberation. State v. Melton, 67 Mo. 594. All intentional homicides committed with premeditation and malice are murders in the second degree. State v. Weimers, 66 Mo. 13; State v. Erb, 74 Mo. 199; State v. Lewis, 74 Mo. 222; State v. Robinson, 73 Mo. 306; State v. Ellis, 74 Mo. 207; State v. Williams, 69 Mo. 110; State v. Eaton, 75 Mo. 586; State v. Moxley, 115 Mo. 644; State v. Lane, 64 Mo. 319. (4) The court erred in not granting the defendant a new trial because the jury were permitted to separate into parties of two and three and go through the Greene county jail. Section 2628, R. S. 1899, prohibiting the separation of a jury in the trial of a capital case, is mandatory. State v. Gray, 100 Mo. 523; McLean v. State, 8 Mo. 153; State v. Murray, 91 Mo. 95. And where such separation takes place the judgment will be reversed although it does not appear that any juror was approached upon the subject of the trial, or that there was any ground of suspicion that they were moved by outside influence. State v. Collins, 81 Mo. 109; State v. Orrick, 106 Mo. 111; State v. Steifel, 106 Mo. 129; State v. Howland, 119 Mo. 419; State v. Schaeffer, 172 Mo. 335.

*Elliott W. Major*, Attorney-General, and *John M. Atkinson*, Assistant Attorney-General, for the State.

(1) Appellant having failed to preserve an exception to the failure of the trial court to instruct the jury on all necessary questions of law arising in the trial, he cannot now urge such failure as a ground for reversal. State v. George, 214 Mo. 270; State v. Urs-

pruch, 190 Mo. 50; State v. Finley, 195 Mo. 211; State v. Chenault, 212 Mo. 137. The record does not contain any request by appellant for any specific instructions. There must be a specific request for additional instructions, and an objection and exception saved to the refusal of the court to give the same, before the question can be reviewed in this court. State v. Espenschied, 212 Mo. 222; State v. West, 202 Mo. 137; State v. McCarver, 194 Mo. 742; State v. Groves, 194 Mo. 558; State v. Bond, 191 Mo. 563. (2) The effect of instruction 6 simply informed the jury that the mere impounding of appellant's cows by Ellis, and his refusal to release them until the damages were paid, were not sufficient legal or just provocation to reduce the killing from murder in the first degree to murder in the second degree. It was not error so to instruct. State v. Bulling, 105 Mo. 219; State v. Barrington, 198 Mo. 102; State v. McKenzie, 177 Mo. 711; State v. Kotovsky, 74 Mo. 247. Appellant was not entitled to have an instruction on murder in the second degree. According to his own testimony at the trial he acted in self-defense, if the jury believe his story to be true; on the other hand, if what appellant said immediately after the shooting, as to why he killed Mrs. Ellis, was true, then he was guilty of murder in the first degree. State v. Neihaus, 188 Mo. 324.

GANTT, P. J.—From a judgment and sentence for murder in the first degree by the Greene County Circuit Court on the 5th day of May, 1909, the defendant, Eugene Tucker, prosecutes this appeal.

The prosecution was commenced by an information filed by the prosecuting attorney of said county charging the defendant with having on the 22d day of February, 1909, at the county of Greene and State of Missouri, feloniously, willfully, deliberately, premeditatedly, on purpose and of his malice aforethought made an assault in and upon Elizabeth Ellis with a cer-

tain deadly weapon, a revolving pistol then and there loaded with gunpowder and leaden bullets, and the said revolving pistol did shoot off at and against her the said Elizabeth Ellis, and with the said revolving pistol and gunpowder and leaden bullets aforesaid then and there feloniously, on purpose and with malice aforethought did willfully, deliberately and premeditatedly shoot and strike her the said Elizabeth Ellis in and, upon the breast of her the said Elizabeth Ellis, giving to her then and there with the said gunpowder and leaden bullets aforesaid one mortal wound, of which said mortal wound she did at the county of Greene on the said 22d day of February, 1909, then and there instantly die.

The defendant was duly arraigned and the cause was submitted to a jury on Monday, May 3, 1909, and on the fifth of May, 1909, the jury returned a verdict of guilty of murder in the first degree as charged in the information and assessed his punishment at death. Motions for a new trial and in arrest of judgment were filed in due time, heard and overruled.

The evidence on the part of the State tended to show the following facts:

Joshua T. Ellis, sixty-three years of age, and Elizabeth, his wife, fifty-eight years of age, on the 22d day of February, 1909, lived about three and a half miles north of the courthouse in Springfield, in a house owned by one Scott. They lived with their son George Ellis, his wife and their two daughters, Mary and Edith. A ten-acre corn field, located north of the Ellis house, owned by a creosoting company, had been leased to Joshua Ellis for a year prior, and at the date of the killing this tract was still in his possession. The defendant Eugene Tucker lived about one-half mile to the north and east of the Ellis home. A boy by the name of Charles Dubel, about seventeen years old, and Arthur Kittrell, a brother-in-law of the defendant, lived with the defendant. A public road leading north and

south lay to the east of the Ellis house, and one run-
ning east and west to the north of the place. A lane
led from the public road on the north down to the Ellis
home on the south. On the morning of February 22,
1909, the defendant left his home about ten o'clock
with a wagon and team and went to Springfield, and
returned about four o'clock that afternoon. While the
Ellis and Tucker families had lived in the same vicinity
for a year or more, they had scarcely a passing ac-
quaintance with each other. Prior to February 22,
1909, the stock law had been adopted and was in full
force and effect in Greene county. About six weeks
prior to February 22, George Ellis had found a horse
and a cow, which belonged to defendant Tucker, in a
small corn field of Joshua Ellis, and they were im-
pounded by George Ellis and his father, and a charge
of $3.25 was made and collected from the defendant in
order to regain the possession of his horse and cow.
On the afternoon of February 22, 1909, Joshua and
George Ellis went to this field for a load of fodder,
about two o'clock in the afternoon, and found two cows
of the defendant in the field destroying the fodder.
George Ellis went to defendant's house to notify him
that the cows were in the field, but not finding him at
home told Kittrell the object of his visit, and an alter-
cation ensued. While the proof is meager, it seems
that Kittrell assaulted George Ellis. George then re-
turned to the field where he left his father and the two
cows, and they drove the cows to his father's barn,
which was about seventy feet from the Ellis home, and
locked them in. The father and son then left in a
wagon for Springfield, and on reaching there filed a
complaint against Kittrell for the assault upon George.
They did not at that time know Kittrell's name and he
was described in the complaint as John Doe. That
same afternoon the constable and a deputy went to de-
fendant's home to arrest Kittrell. Joshua Ellis went
with them to identify Kittrell. The officers and Joshua

Ellis went past the defendant's house about one hundred and fifty yards where they parted, and Joshua went directly south to his home. As the officers came back towards the defendant's house they met him and inquired if he knew Kittrell, and at first he denied that he knew such a person, but admitted finally that he knew him and promised to bring him to Springfield the following morning and surrender him to the officers.

The defendant thereupon told the officer that Joshua Ellis had his cows impounded and that he was, on his way to get them. The officers observed that the defendant was very angry and testified that he cursed Ellis saying "the d——d old s—— of a b——, has got my cows." He requested the officers to go and look at the corn field and see that there was nothing there which the cows could hurt, but they informed him that Joshua Ellis had told them that defendant might have his cows if he would come after them. The deputy constable testified that in this connection the defendant "shook himself and said, 'I have got no gun or anything; I am not armed; I am going down to get my cows, and if I can't get them one way I will get them another.'" After this statement the defendant then went on west towards the Ellis home and the officers returned to the city. Between five and five-thirty o'clock that afternoon, the defendant and the boy Dubel came to the Ellis house and demanded of Joshua Ellis that his cows be given him. This Ellis declined to do unless defendant would pay the damages and this the defendant refused to do. Thereupon defendant and the Dubel boy returned to defendant's home without the cows. At the time of leaving the defendant said, "He would come back and come prepared." In about thirty minutes both the defendant and the Dubel boy did return. Joshua Ellis and his wife Elizabeth, and his granddaughter, Mary Ellis, and a child about five years old, were the only persons at the Ellis home when the defendant came back the second time for the cows.

Mrs. George Ellis and his daughter Edith had gone to meet George, who was driving a team home from Springfield. George Ellis did not reach home until after six o'clock, and after the shooting had taken place.

When the defendant came back the second time he called Joshua Ellis and the two walked towards the barn in which the cows were impounded. Mrs. Elizabeth Ellis followed close to her husband. Mary Ellis, the granddaughter, came out of the house and was standing on the porch; she could not distinctly hear the conversation between her grandfather and the defendant. When near the barn, the three stopped. Joshua Ellis was facing toward the south, the defendant was facing towards the north, and Mrs. Elizabeth Ellis stood to the west; the position of the three formed a triangle. Mary Ellis testified that she saw the defendant take his revolver, which proved to be a .38 Smith and Wesson, out of his overcoat pocket, with his left hand, and change it to the right hand while he was saying something to her grandfather, Joshua Ellis, which she could not understand, and then she saw him shoot her grandfather, who at the first shot stooped or dodged downward, and at the second shot, staggered backward and fell. She does not remember the number of shots that were fired or just how the others were fired. She next saw her grandmother, after the shooting ceased, coming in from the porch, and on approaching the kitchen she fell. While the shooting was going on Mary was greatly excited and was hallooing to some neighbors who lived close by. Immediately after the shooting the defendant came to the house and demanded of Mary the key, so that he could turn the cows out, and she threw it at him in the yard. He and the Dubel boy then got the cows and started to their home. The defendant reloaded his pistol while waiting for Mary to get him the key. The neighbors who had heard the shots came and Joshua was carried into the

house where he died in about thirty minutes, and his wife died in about forty-five minutes. Neither made any statements or did any talking after the shooting. The testimony on the part of the State was to the effect that the defendant wore his overcoat each time he came after the cows.

As defendant and the Dubel boy were taking the cows home after the homicide, Luke Wallace met them as he came down the road from the north; he had heard the shooting, and he testified that he met them some two or three minutes afterwards. He had traveled about one hundred yards. The defendant was following the cows when he came in sight of Wallace, he drew up his gun and hallooed if that was the other s—— of a b——, whereupon Wallace asked him what was the matter and defendant said: "I killed two of the s—— of b——, and stuck up two fingers, and says I will kill the other s—— of b——." Wallace asked him what two he had killed and defendant answered, "The old man and the old woman."

The coroner reached the Ellis home about 7:30 that evening. He testified that he found Mrs. Ellis dead lying on the floor of the kitchen, he found one bullet that had gone in just where the clavicle bone joins the breast bone on a downward tendency and came out at the shoulder blade; one bullet hole through the right arm, and one flesh wound on the right breast about four inches below the breast bone and about two inches above the nipple, and a flesh wound one-half way between the elbow and hand on the left wrist. The one that entered the thoracic cavity and came out at the shoulder blade was necessarily fatal. He did not think the other wounds would have killed her.

He examined the person of Joshua Ellis and found one bullet had entered the abdominal cavity below the right hip, passed clear through and came out a little below the left hip. Another bullet had entered the

mouth, passed straight through the head, and came out a little above the lower part of the ear.

The testimony tended to show Joshua Ellis weighed about 125 pounds and was rather frail, walked somewhat stooped as a usual thing, with his hands resting, on his hips. Mrs. Ellis weighed about the same as her husband and was a delicate woman. Mary Ellis, the only eye-witness to the killing, testified that her grandfather took no step towards the defendant, either prior to or at the time of the shooting, nor did he make any motion or gesture with his hands that would lead the defendant to believe he meant to do him any bodily harm. Some of the near-by neighbors testified they heard as many as six pistol shots; that four of them were in close succession, and then a pause, and the two remaining shots were fired with some time between them. After the shooting the defendant went to Springfield and surrendered to the police and gave up his revolver, which was a six shooter.

The defendant testified in his own behalf. He said that at the time he saw the officers and made the statement to them he was not armed; that he did not have on his overcoat, but sent the boy Dubel to the house for his coat and before he made his first trip to the Ellis house after his cows; that he put the pistol in his pocket the night before when he went out to see about some hogs that were being disturbed by dogs, but that the pistol was in his overcoat pocket when he went after his cows the first time that afternoon; that it was his custom to carry his pistol in his overcoat pocket. He testified that he had told Joshua Ellis that when he came back "he would come prepared," but this was in answer to a statement by Ellis that he should come prepared to pay the damages that he claimed the cows had done, and it was not as a threat that he would come armed. That he went home to get the money from his wife to pay the damages; that he got some two or three dollars from her, and he was not angry at that

time, and took a drink of coffee before returning to the Ellis home. His wife testified that she told him where to get the money and that he got some two or three dollars, she did not know the exact amount. The defendant insisted that the killing of Mrs. Ellis was purely accidental; that he had no motive or reason for killing her. He testified that when he got back to the Ellis home the second time Mr. Ellis was in the kitchen sitting by the window, and he came out and he and the defendant walked down to the barn together. He testified that when Mr. Ellis stepped out on the porch he said to defendant, "Well, damn you, you are back here again," and defendant said, "Yes, sir, but I do not see any occasion for you talking to me that way," and Ellis asked him, "Why in the h— he did not get the cows when he was there before?" and defendant said: "I told you why I did not get them, I did not have the money. I had to go home and get it. I am now prepared to get the cows; I have got the money." By that time they had reached the barn and defendant said, "Mr. Ellis, open the barn and let me have my stock, I am here for it, came for that purpose." Whereupon Ellis said, "Well, you G— d— s— of a b—, I will give you the stock when I get ready and not before." Whereupon defendant told him that his conduct was uncalled for, that he did not come for any trouble, whereupon he says that Ellis said, "Well, d— you, you won't get that stock until I get ready to give it to you," and made a motion of putting his hand to his hip pocket, and made a step towards the defendant, whereupon defendant stepped back and reached for his gun, and said, "Give me that stock," and Mr. Ellis made a step towards him and defendant commenced shooting and kept shooting until his pistol was empty. He testified that he did not know that Mrs. Ellis was near him; he did not know that there was a single person on the premises except Mr. Ellis and himself. That he had no more intention of shooting Mrs. Ellis

than his own mother. He would no more have killed her than he would his own mother. He had no reason to do so and did not want to do it. He was excited and could not help doing it. He was crazy at the time; he did not know the woman was there; never had anything to do with her, and she never had anything to do with the trouble. He had never seen Mr. Ellis to know him prior to that day.

The defendant also offered evidence tending to prove that his reputation as a peaceable and law-abiding citizen was good. The defendant also attempted to prove that the reputation of Joshua Ellis as a quarrelsome and overbearing man was bad. The proof in this record was that Joshua Ellis had put up some other people's stock and had had some trouble concerning the same. One of the character witnesses did not have any personal acquaintance with the deceased Joshua Ellis.

The court submitted the case to the jury on instructions as to murder in the first degree, murder in the second degree, and self-defense.

Various grounds are urged to reverse the judgment of the circuit court.

I. It is assigned as error that the court failed to instruct the jury on the whole law applicable to the facts in evidence. The defendant did not request any instructions, and after the court had given its instructions to the jury, the defendant did not request the court to instruct on any other view of the law, nor did he save any exception to the failure of the court to instruct on all the law applicable to the facts in evidence. This point can avail nothing in this state of the record. [State v. Bond, 191 Mo. l. c. 563; State v. McCarver, 194 Mo. l. c. 742; State v. Groves, 194 Mo. l. c. 458; State v. West, 202 Mo. l. c. 137.]

II. Among other instructions, the court gave one numbered 6, in these words: "You are instructed that

the heat of passion which destroys deliberation and which reduces a killing from murder in the first degree to murder in the second degree, must be a heat of passion, the result of some conduct or action on the part of the deceased, Joshua Ellis, such as will be reasonably calculated to arouse passion on the part of the defendant, and in this connection you are instructed that it is not sufficient to reduce the killing to murder in the second degree that defendant was in a heat of passion, but he must have been in a heat of passion produced by lawful provocation on the part of Joshua Ellis, and in this connection you are further instructed that the fact that deceased, Joshua Ellis, impounded or took up the cattle of defendant, and refused to deliver the same to defendant on demand therefor, is not sufficient legal provocation to reduce the killing from murder in the first degree to murder in the second degree."

The court also gave the following instruction numbered 7: "If you believe from the evidence that the defendant intentionally shot and killed Elizabeth Ellis, then you are instructed that there is no evidence of such provocation as would reduce such intentional killing of the said Elizabeth Ellis from murder in the first degree to murder in the second degree."

The court also gave the following instruction numbered 12: "You are instructed that if you find and believe that the defendant, Eugene Tucker, at the time and place mentioned in the second instruction, feloniously, willfully, premeditatedly, and of his malice aforethought, but without deliberation, shot at Joshua Ellis with the intention of killing him, but missed him, and thus accidentally shot and killed Elizabeth Ellis, then you will find the defendant guilty of murder in the second degree, although you may believe that the defendant at the time did not intend to shoot or kill the said Elizabeth Ellis."

The record contains not a scintilla of testimony tending to show any act or word on the part of the de-

ceased, Mrs. Elizabeth Ellis, which would or could pro-
voke a heat of passion on the part of the defendant.
Indeed the testimony of defendant himself absolves
her from any word or act which could have aroused a
heat of passion which would have reduced the killing
of Mrs. Ellis to murder in the second degree, if he in-
tentionally shot and killed her.    He testified he did not
know she was on the ground at all, and in the nature
of things he could not have been provoked by any word
or act of hers.    If there was any provocation, it must
necessarily have been some word or act of Joshua Ellis,
the husband.    This instruction told the jury that in
order to reduce the killing from murder in the first de-
gree to murder in the second degree, it must have been
done in the heat of passion caused by some conduct or
action of Joshua Ellis, such as would reasonably arouse
passion on the part of the defendant, and the fact that
Joshua Ellis impounded or took up the cattle of de-
fendant and refused to deliver the same to defendant
on demand therefor was not sufficient legal provocation
to reduce the killing from murder in the first degree
to murder in the second degree.    Certainly it was not
erroneous, to this extent.    The only basis of an instruc-
tion for murder in the second degree is found in in-
struction number 12, which permits the jury to find
defendant guilty of murder in the second degree if he
feloniously and premeditatedly shot at Joshua Ellis
and thus accidentally shot and killed Mrs. Ellis, and the
instruction is bottomed upon the testimony of defend-
ant himself, to the effect that he had no intention of
shooting her; that he had no reason for it; that he was
excited; he could not help it; was crazy at the time;
did not know she was there.

All the evidence concurs in showing that the killing
was done in daylight, in an open barn yard, with noth-
ing to prevent defendant from seeing Mrs. Ellis.    As
they stood a moment before the shooting began they

formed a triangle. Defendant faced to the north, Joshua Ellis to the south, and Mrs. Ellis stood west of them. Joshua Ellis received two wounds only, either of which, according to the coroner, would have been fatal, and sank where he stood. Now if Mrs. Ellis had been in a position to receive the bullets shot directly at her husband, she would have been in the line of defendant's vision, but he positively asserts he did not see her and did not know she was on the ground, but if she was not where he could see her, she was not in the line of the shots fired at her husband, and this accords partly with what the young lady granddaughter testified, when she placed Mrs. Ellis on the west. How then are we to account for the four shots received by Mrs. Ellis? There seems to be no rational explanation save that defendant after killing the husband turned his revolver to the west on the unoffending wife, and shot her to death as he told Mr. Wallace he had done when he met him a few minutes later in the road. It seems to us that if there ever was a case in which a court and jury could say that the statements of the defendant so contradict the physical facts, and his conduct was so unreasonable and inconsistent with the experience of mankind, that the court was not bound to believe him and instruct the jury on his testimony for a less grade of offense, this is the one. [State v. Nelson, 118 Mo. 126; State v. Turlington, 102 Mo. 642; State v. Bryant, 102 Mo. 24.]

Unquestionably the court was right in instructing the jury that if they found the defendant intentionally shot and killed Mrs. Ellis, then there was no evidence of provocation, and there was nothing to reduce the killing to murder in the second degree. This court long ago ruled that where there was no evidence of either lawful or just provocation it was the duty of the trial court to tell the jury there was none. [State v. Ellis, 74 Mo. 1. c 220.] Where there is no provocation, the fact that the court may err in its

definition of what constitutes provocation will furnish no ground for reversal, especially as in this case where it correctly told the jury that the impounding of defendant's cattle under the stock law, and a refusal to deliver them upon demand was not a sufficient provocation to reduce the killing to murder in the second degree.

The court instructed for murder in the second degree in a proper instruction, and the defendant had the full benefit of this theory of an accidental killing in his attempt to kill Joshua Ellis, but the jury refused to believe his statement that he accidentally shot the deceased four times in broad daylight, with no obstacle to prevent his seeing her. His testimony on this point was wholly at variance with the vile epithet he applied to her after killing her when talking to Mr. Wallace. We think the defendant has no ground to complain of the instructions. They were exceedingly favorable in view of the evidence.

The criticism of the 7th instruction is that it eliminates all the elements of murder except intentional killing. This we think is a misapprehension of the purpose of the instruction. It was only one of the series, all to be read and considered together. The court had elsewhere correctly defined the technical words, and instructed as to all the elements of murder in both the first and second degrees. It had instructed on the theory of an accidental killing of Mrs. Ellis in an attempt to murder her husband, but without deliberation, but it must have been apparent that the jury might and would not believe the statements of defendant in the face of the physical facts and other testimony, and hence the court properly instructed the jury that if defendant did not accidentally but intentionally shot and killed Mrs. Ellis with a deadly weapon then there was no provocation under the evidence which would reduce the homicide to murder in the second

degree. The instruction read in connection with the others was consistent, correct and proper.

III. Error is assigned in that the jurors were permitted to separate and go through the Greene county jail while this cause was in progress. It appears that the first night after the trial began, the jury were kept in the office room of the sheriff in the jail for two or three hours; that during that time some of the jurors in charge of the sheriff were taken through the corridors and around the cages in which prisoners were confined. There was no communication with any of the prisoners or other persons. The separation of the jury is not made a ground for new trial in the motion. Moreover, it nowhere appears at what time the knowledge of such alleged separation came to defendant or his counsel.

In State v. Barrington, 198 Mo. 1. c. 93, 94, it was said by this court: "Upon this assignment of error it will suffice to say that the record fails to disclose at what time the knowledge of such misconduct complained of came to appellant or his counsel. This is fatal to the contention urged by appellant upon this proposition. In 12 Ency. Pl. and Prac. 558, the rule of practice upon this subject is thus announced: 'When a party moves for a new trial on the ground of misconduct which occurred during the trial, he must aver and show affirmatively that both he and his counsel *were ignorant of the misconduct charged until after the trial.'*" [State v. Robinson, 117 Mo. 649; State v. Hunt, 141 Mo. 626; State v. Richardson, 194 Mo. 1. c. 337; State v. Mathews, 202 Mo. 1. c. 149.]

For these reasons, it must be held this ground for reversal is not before us for review.

IV. The remarks of Judge Page to the jury on the morning following the retirement of the jury on the previous afternoon, are urged as ground for reversal. Those remarks were: "Gentlemen, if this case is ever

decided it will have to be decided by twelve men. You are all intelligent, fair-minded men, and if you fail to agree, where can a jury be found who can agree? While it is not within the province of the court to try to force you to an agreement, and while I would not ask or suggest that any juryman ought to agree to a verdict that would not meet the approval of his conscience, still I feel that you ought not to be discharged until you have deliberated further, and made further endeavor to reach an agreement.'' Some two hours after the jury retired they returned a verdict of guilty.

Under the Constitution of this State the defendant was guaranteed a trial by jury. He was entitled to the free and untrammelled judgment of the jury upon his innocence or guilt of the crime charged. The judge can not invade the province of the jury. This has been too often decided to require a citation of authority. The sole question is, can the remarks of the learned circuit judge be fairly construed to have unduly influenced the jury? We think not. Much must be left to the judge who tries a cause in determining how long he will keep a jury together in the consideration of their verdict. If it can be seen that he threatened even indirectly to punish the jury by keeping them together and thus coerce a verdict this court will interfere as it has done in various cases, but in this case, there was no intimation that the court intended to keep the jury together until they reached a verdict. On the contrary, he expressly told them it was not his province to try to force them to an agreement and that he would not suggest or ask that any juror agree to a verdict that would not meet the approval of his conscience, but owing to the importance of the case he thought they should deliberate further. In our opinion this was not improper. The jury had not been out an unreasonable or unusual length of time for a case involving a human life. These remarks fall far short of those which we have held constituted reversible error. They amounted to no more

than if the court after inquiring if they had agreed upon a verdict, had simply said, you can retire and consider further. This is done every day and it has never been regarded as error. In our opinion the facts of this case differentiate it from those in State v. Hill, 91 Mo. l. c. 428; State v. Nelson, 181 Mo. l. c. 344, and State v. Eatherly, 185 Mo. l. c. 181, and our conclusion in no way militates against the reasoning of those decisions.

V. In a general way the competency of certain jurors is challenged, but their names are not set out in the motion. However, five of the jury were named in the brief of counsel. Of these Messrs. Tracey and Russell were not challenged, and no exceptions were saved to the action of the court in accepting Messrs. Thurston, Wardell and Dillard. We have carefully read the *voir dire* examination of each of these jurors and in our opinion they were all competent jurors. The challenges were moreover insufficient as they stated no ground for the challenge.

Having carefully gone through the record, we have discovered no substantial error in it. The killing of the unoffending and harmless old lady in the circumstances detailed in the transcript, was so utterly without provocation or rational motive, that a jury could not have reached any other conclusion than that it was a deliberate and premeditated murder, without a redeeming feature in the case.

The judgment and sentence of the circuit court must be and is affirmed, and it is ordered that the sentence of the circuit court be executed as directed on January 26, 1911.

*Burgess* and *Kennish, JJ.,* concur.