## TOM BIRDWELL v. UNITED STATES.

No. A-1580. Opinion Filed October 11, 1913.

(135 Pac. 445.)

1. STATES—Admission—Effect — Procedure — What Law Governs. Enabling Act, sec. 3, provides that: ''All criminal cases pending in the United States courts in the Indian Territory, not transferred to the United States Circuit or District Courts in the state of Oklahoma, shall be prosecuted to a final determination in the state courts of Oklahoma under the laws now in force in that territory.'' Held, that under this provision the law in force in the Indian Territory at the time the indictment was returned, and the rules of evidence as they existed at that time, controlled in this case.

2. WITNESSES—Competency — Husband and Wife. Section 1974, subd. 4, Ind. T. Ann. St. 1899, provides that the husband and wife shall be incompetent to testify for or against each other. Held, that the court properly sustained an objection to the competency of the defendant's wife to testify as a witness in his behalf.

3. EVIDENCE—Self-Serving Declarations. Declarations of the defendant made after the homicide and in reference to it, held self-serving and properly rejected.

4. APPEAL—Objections in Trial Court. A general exception to instructions given upon the trial of a case will not be considered. Counsel should point out to the trial court the particular instruction to which they desire to except, in order that the court may have an opportunity to correct the error therein, if any.

5. FORMER JEOPARDY—Setting Aside of Judgment. A defendant, under an indictment for murder returned in a United States court of the Indian Territory, who upon his trial was convicted of manslaughter, and who procures the judgment against him to be set aside, may be tried anew for the crime of murder.

*Appeal from District Court, Pontotoc County;*
*Tom D. McKeown, Judge.*

Tom Birdwell was convicted of manslaughter on an indictment charging murder, and appeals. Affirmed.

This was an indictment in the District Court of the United States within and for the Southern District of the Indian Territory for the murder at Bebee, Ind. T., in what is now Pontotoc county, on September 10, 1907, of Jim Goodson, by shooting him with a shotgun loaded with buckshot. The case was pending in said court at the time of the admission of Oklahoma as

a state, and upon a trial in the district court of Pontotoc county, to which the case was transferred after statehood, the defendant, Tom Birdwell, was found guilty of manslaughter, and sentenced to imprisonment for ten years. On appeal to this court the judgment was reversed. See 4 Okla. Cr. 472, 113 Pac. 205. Upon his second trial he was convicted of manslaughter, and in accordance with the verdict of the jury, was sentenced to serve a term of seven years' imprisonment in the penitentiary, and to pay a fine of $500.

R. L. Rollins was the first witness for the prosecution. He testified that he was engaged in the general merchandise business, and was postmaster at Bebee; that on the 10th day of September, 1907, when the sun was about an hour high, Jim Goodson, the deceased, came into his store and said he wanted a sack of flour and a piece of meat, and he told him he was out at that time. Bob Hatcher then said to him, "Jim, I want to see you," and they turned and walked out of the south door that was in front of a partition that divided the store; that in about ten or fifteen minutes Tom Birdwell, the defendant, came into the store carrying a double-barrel shotgun, and came to the door of the partition where he was pumping coal oil; that he said to defendant, "There is no one here except myself," and defendant went out this door. In a few minutes he heard the shots and saw Goodson lying on the ground in front of Hinkle's store, "which is about 60 yards east of my store." After the sun went down he went with some men and helped take him up. The defendant came to the post office and called for his mail, but did not say anything.

The widow of the deceased testified: That on the day her husband was killed they were moving from one place near Bebee to another farm, and in the afternoon had loaded up two wagonloads of household goods and started away, her husband driving one wagon and Dock Corbitt the other. That they stopped the teams at Bebee, and her husband went to buy some groceries, and Dock Corbitt went with him, leaving her and her two children, one nineteen months old and the other two weeks old, with the wagons. That a few minutes after they left her, Tom

Birdwell and Blake Allen passed in a buggy. Blake Allen was driving, and Birdwell had a shotgun, and as they passed Birdwell said to her, "'Howdy,' in a loud way like he was mad." That she saw her husband going from Rollins' store to Hinkle's store, and when he was just a few steps from Hinkle's store, the gun fired. That her husband halloed, then two shots more were fired from the direction of Rollins' store. That she laid her baby down and ran over, and Birdwell was standing over her husband cursing him when she came up, and Blake Allen was standing there with a six-shooter in his hand.

P. L. Bowerman testified that he was a merchant at Bebee and saw Birdwell between his house and place of business after the first shot was fired, and he fired the second time; that Birdwell walked up to Goodson's body with a six-shooter in his hand, and he was cursing and calling Goodson hard names; that he stooped down over the body and took a pistol and tossed it off on the ground, and in a short time he came to witness' store and wanted witness and another man to examine the pistol that had been picked up at Goodson's body, and said to keep it until it was called for at court; that Goodson only lived a few minutes after he was shot.

Costa Bowerman testified that he was fourteen years old, and saw the deceased passing from Rollins' store, going towards Hinkle's store, and saw the defendant going down the same way; that he heard the defendant say, "Oh, Jim!" and the deceased turned about halfway around towards him, and the defendant fired his gun and the deceased fell to the ground, and the defendant fired another shot; that as the deceased fell he said, "Oh, Lordy!"

Mrs. P. L. Bowerman testified that she heard Blake Allen say just before the shooting, "Here he goes, Tom"; that Birdwell had a gun in his hand, which he immediately shot; that she walked about six feet, and Birdwell shot again.

Dock Corbitt testified: That he was helping the deceased to move that day. That they stopped the wagons in Bebee and went to the stores to get some meat and flour; that the deceased was talking to Bob Hatcher out in the back way when Tom

Birdwell and Blake Allen drove up. Birdwell got out and came through the store with a shotgun in his hand, and Mr. Rollins told him, "There is no one here," or, "He is not in here," or something of that kind, and Birdwell went out, and witness remained in the store until it was all over.

E. D. Hinkle testified: That he met the deceased that evening, and saw Tom Birdwell and Blake Allen drive up and stop in front of Rollin's store, and Birdwell got out and went into the store. That he saw the deceased come towards witness' store, and that Birdwell was following him, 60 or 70 feet behind. That the stores are about 90 feet apart. That he heard Birdwell call "Jim" twice and the deceased started to turn around and witness stepped to the other side of the store. Just then a gun fired; in two or three seconds another gun fired, and Jim Goodson was lying still on the ground, and Tom Birdwell was coming towards him with a revolver in his hand, and Birdwell said: "Oh, yes, God damn you; your gun hung on you"—and continued to curse him.

W. E. Dunham testified that he saw the several parties that evening, and the defendant got out of a buggy and went into Rollins' store with a shotgun; that he saw the deceased come from behind Rollins' store, going east with the defendant following him, and Blake Allen said "Here, Tom, here he goes"; that the defendant was traveling fast; that the defendant called to Goodson, saying, "Jim," and then again, "Jim, hold up"; that when the defendant shot him Goodson's hands were down to his sides; that the defendant then walked up and took Goodson's gun off of him and cursed him.

W. P. Abbott testified that he was in the post office in Rollins' store when the defendant came in with a double-barrel shotgun; that he saw him after Goodson was shot, with a six-shooter in his hand, and that Blake Allen had a shotgun in his hand; that just before the shooting he heard a voice say, "Hold up," or "Hold on," and that it was Birdwell's voice; that he examined the body, and it had eleven shots in the left side and twelve shots on the right side; that he was shot in the neck and in the shoulder.

A. B. Roberts was the first witness for the defense. He testified that he had known the deceased six or eight years, and knew his reputation. "He was tolerably rough."

Lish Burleson testified that he could not say that he knew deceased's reputation as a troublesome character, but thought it was bad, but did not hear anybody except the defendant say he was a dangerous man.

George Waldby testified that he knew the deceased's reputation for being a troublesome man, and that "he was kinder raising disturbances around through the country," but did not know whether he was considered a dangerous man.

D. C. Highboger testified that he knew the deceased's reputation for being a fussy, overbearing man, and it was bad, but that he was not considered altogether dangerous.

Kit Guest testified that he knew the deceased's reputation "for being a fussy, trouble-raiser, and it was bad."

D. C. Highboger, recalled, testified that the deceased made a remark to him that he was having intercourse with Birdwell's wife, or words to that effect, but that he never told Birdwell about it.

Bob Hatcher testified that he called on Goodson to pay for some corn that he had given to Tom Birdwell, and that Goodson had stood for, and Goodson asked how much Birdwell got, and that witness answered that he did not know; that he had it on a book at home, and Goodson went on and said, "if I wanted the money I had better get it, and get it damn quick"; that he was going to shoot the damn son-of-bitch's head off; that this conversation was about 30 minutes before the killing, and that Hatcher did not tell Birdwell about it.

J. M. Greer testified that he lived at Bebee; that three or four days prior to the killing Jim Goodson remarked to him that if Tom Birdwell owed him anything he had better get it; that he was going to kill the red-headed son-of-a-bitch; that a few days before the killing he met the defendant at the Corner saloon, and the defendant told him that while he was in jail Tom Goodson went and took possession of a well machine, and he could not get it, and he said he had a wagon and harness at

his place that belonged to Goodson, and that he told Birdwell about the threats he had heard Goodson make; that he was in Rollins' store at the time of the killing; that he knew there was going to be trouble, and he looked out and saw the deceased raising his right hand up, and walked on a few steps further and looked back, and shortly afterwards the gun fired; that he had heard the deceased say that "the defendant's wife was not anything more than just a damn whore."

Guss Bobbitt testified that he was acquainted with the general reputation of the deceased for being a violent, overbearing, and dangerous man, and that it was bad.

Bud Lawson testified that a couple of months before the killing he heard the deceased hallooing out around the defendant's place, and there was some shooting at that time; that the defendant, Tom Birdwell, lived up close to the Corner saloon.

Villy Wilson testified that he was working for the defendant, and the deceased came over on the defendant's place and fired a couple of shots; that deceased then came up to the house and called for a gun he had there, his steel-ball Winchester, and Mrs. Birdwell gave it to him, and asked him not to shoot there; that he got on his horse and started off and whooped and started to shooting; that the defendant was running a well drill at that time; that this was two or three weeks before the killing.

Blake Allen testified that on the day of the killing he went to Ada with the defendant, and they went from Ada to the Corner saloon, and there drank some whisky; that they went from there to Bebee; that the defendant went there to get his mail; that the defendant got out and went into the post office, carrying a shotgun; that while he was in there witness saw Jim Goodson going in the direction of Hinkle's store; that the defendant came out and witness said to him, "Come on and get in the buggy and let's go home"; that Goodson turned his head and looked back and put his right hand to his bosom; that the defendant hallooed at him not to do that, to stop that, and said this once or twice; that Goodson whirled about half around and the defendant shot; that Goodson still had his hand in his bosom

on his gun, and the defendant shot again; that the defendant then said to witness, "Give me my pistol," and he gave it to him, and the defendant walked to where Goodson was lying; that shortly after they returned to the Corner saloon.

S. B. Bailey testified that deceased told witness he was going to have Tom Birdwell put under a peace bond of five feet of dirt, and that he was going to shoot Birdwell's brains out as soon as he met him; that witness told the defendant about it a short time before the killing.

Tom Birdwell, the defendant, testified in his own behalf: That his wife told him that the deceased came there and shot and cut up and raised cane. That he had to get a doctor for one of the children after the deceased run the children out of the field. That he was in jail at Ardmore, and the deceased had been on his bond, and the deceased turned him up on his bond, and he was put back in jail and was there two or three weeks before he made another bond. That when he came home his wife told him of an indecent proposition the deceased made to her. That he had heard of the threats the deceased made against him; that on the day of the killing he went to Ada, and from there to the Corner saloon, and from there to Bebee; that as he passed the wagon where Mrs. Goodson was he was looking for Goodson to shoot as he went by. That when he stepped out of the store he saw the deceased going in the direction of Hinkle's store. That he had started to his buggy, and the deceased put his hand in his bosom, and he said to him, "Don't Jim," or "Stop, Jim," or, "Hold up, Jim"; when he saw deceased's gun in his hand he shot him twice; that he went over and took deceased's six-shooter from him, and said to him: "You are a dead man, and I am in trouble; your damn gun hung on you or I would have been dead." His wife ran up with a shotgun in shooting position, and I said, "Nora, you are a good woman, I don't want to kill you, but don't you shoot me." That he went to the post office and asked for his mail, and then went to the Corner saloon and waited to give up. That he had been in the penitentiary three years on his first sentence. That both barrels of his shotgun were loaded with buckshot. On cross-exam-

ination he admitted that he was convicted in Texas of horse stealing, and in Indian Territory and in Oklahoma of whisky selling.

In rebuttal several witnesses, recalled, testified that the deceased did not raise up after he fell and try to shoot the defendant.

· *Crawford & Bolen,* for plaintiff in error.

*Chas. West,* Atty. Gen., and *Smith C. Matson,* Asst. Atty. Gen., for the United States.

DOYLE, J. (after stating the facts as above). The plaintiff in error was convicted of manslaughter on an indictment charging murder, and appeals to this court for a new trial.

There is no dispute whatever with respect to the fact that on the 10th day of September, 1907, at the place charged in the indictment, the defendant shot and killed Jim Goodson with a double-barrelled shotgun, having deliberately fired two shots at him, both of which took effect, killing him almost instantly. The defense was self-defense. Aside from the testimony of the defendant and his codefendant, the state's evidence is undisputed that the defendant followed the deceased for the purpose of assassinating him.

Two assignments of error are relied on for a reversal of the judgment: First, the court erred in rejecting evidence; second, the court erred in giving instructions.

It is contended that the court erred in sustaining an objection to the following question propounded on cross-examination of the witness R. L. Rollins:

"Q. I will ask you to state if he did not also make a statement there that Mr. Goodson's gun hung on him? By Mr. Wimbish: Objected to because it is incompetent, irrelevant, and immaterial. By the Court: Objection sustained. By Mr. Bolen: The defendant excepts and expects the answer to be in the affirmative."

It is apparent that this was an attempt to prove a self-serving declaration. It formed no part of the *res gestae,* and was not admissible as original evidence on behalf of the de-

fendant. If the state had called out a part of the conversation
in which this formed a part, it may be the defendant would
have been entitled to show all of the conversation, but there was
no testimony from this witness in chief as to any statement hav-
ing been made by the defendant at the time. We think the court
very properly sustained the objection.

On the trial the defendant offered as a witness Emma Bird-
well, who stated that she was the wife of the defendant, Tom
Birdwell. Thereupon the state objected to the witness testify-
ing, because as the wife of the defendant she was incompetent.
The objection was sustained, and exception allowed. Of this
ruling the defendant complains. The offense charged was com-
mitted before statehood, in the Indian Territory. Section 1974,
subd. 4, Ind. T. Ann. St. 1899, provides that the husband and wife
shall be incompetent to testify for or against each other, or
concerning any communication made by one to the other during
the marriage. In the amendment to Enabling Act, sec. 3 (sec-
tion 438, Williams' Ann. Const.), it is provided that:

"All criminal cases pending in the United States courts in
the Indian Territory, not transferred to the United States Cir-
cuit or District Courts in the state of Oklahoma, shall be prose-
cuted to a final determination in the state courts of Oklahoma
under the laws now in force in that territory."

Under this provision of the Enabling Act the law in force
in the Indian Territory at the time the indictment was returned
and the rules of evidence as they existed at that time controlled
in this case.

Various criticisms are made upon the charge of the court
in the defendant's brief. The record shows that only a general
exception was taken to the charge, and that after the instruc-
tions were read to the jury. It is as follows: "Comes now the
defendant and excepts to each and every instruction given by
the court to the jury from No. 1 to 22, inclusive." While it
is undoubtedly true that this court, in the interests of justice,
even where no exceptions are taken, has the right to reverse
for erroneous instructions, yet this court will not encourage
the practice of counsel not calling the attention of the trial court

to the instructions excepted to at a time when they could be corrected. We have often held that the charge of the court must be considered as a whole; and, from a careful examination, we find that the charge of the court in this case, considered as a whole, contains a full and fair presentation of the defense, and the criticisms made thereon are not well founded. The only error apparent in the charge was in the defendant's favor. The court on its own motion instructed the jury "that the defendant has been acquitted of the charge of murder, and now stands charged of the crime of manslaughter, which is embraced and included in the charge of murder, and to which charge the defendant has entered his plea of not guilty."

It is well settled by decisions of the Supreme Court of the United States that a defendant who procures a judgment against him upon an indictment to be set aside, if a new trial is granted, may be tried anew for the same offense. The verdict of manslaughter rendered by the jury on the defendant's first trial was not equivalent to an acquittal of the defendant of murder, and was not a bar to a second trial for murder as charged in the indictment.

We find nothing in the record of which the defendant has any just complaint, and there seems to be no reason to doubt that the verdict of the jury was entirely in harmony with the interests of justice.

The defendant committed a wanton, cruel, and deliberate homicide, and a verdict of murder, if that issue had been submitted, would not have been unwarranted by the evidence.

The judgment is affirmed, and it is directed that the mandate be transmitted forthwith.

ARMSTRONG, P. J., concurs. FURMAN, J., absent and not participating.