# GRANSDEN v. STATE.

No. A-2156.   Opinion Filed February 10, 1916.

On Rehearing, June 17, 1916.

(158 Pac. 157.)

1. **EVIDENCE—Self-Serving Declarations—Res Gestae.** In a prosecution for murder, self-serving declarations of the defendant made about ten minutes after the homicide and in reference to it, **held** properly excluded as no part of the **res gestae.**

2. **REFUSAL OF INSTRUCTIONS COVERED.** Refusal to give instructions substantially covered by the instructions given is not error.

3. **HARMLESS ERROR—Instructions.** When the instructions taken and considered together embrace the law of the case, though one of them may be erroneous, still for such error a judgment of conviction will not be reversed, unless it shall appear from the whole record that it was prejudicial to the substantial rights of the defendant.

4. **HARMLESS ERROR — Instructions — Reasonable Doubt.** An instruction defining "reasonable doubt" as "a doubt for which there exists a reason in the minds of the jurors, founded upon the facts and circumstances in proof in the case, and is a state of mind of which an ordinarily intelligent man could readily give an explanation, consistent with the facts disclosed by the evidence and the law as given to the jury by the court," while improper, was not of sufficient consequence in this case to constitute reversible error.

5. **HOMICIDE — Repelling of Assault — Self-Defense.** A person assaulted is justified in using so much force as is necessary to his defense; and to repel a simple assault the person assaulted is not authorized to attack his assailant with a deadly weapon, and he is not justified in doing acts calculated to destroy the life of his assailant, unless the assault is of such a character as to excite his fears, as a reasonable man, of danger to life or great bodily harm, and if his assailant retreats in good faith, and he pursues and kills him with a deadly weapon, the killing cannot be justified on the ground of self-defense.

6. **HOMICIDE—Manslaughter—Sufficiency of Evidence.** Evidence in a homicide case considered, and **held** sufficient to sustain a conviction of manslaughter in the first degree.

## ON REHEARING.

7. **TRIAL—Instructions—Applicability to Case.** Where the unimpeachable physical facts squarely contradict the words of the

defendant upon the witness stand, and show the theory of his testimony to be absurd, courts are not required to ignore such physical facts and give instructions not in harmony with them, but absolutely subversive of the theory they mutely and unalterably declare.

8.    **TRIAL—Instructions—Rule of Evidence.** The court by its instructions is not required to invite a doubt, where nothing can be more unreasonable than to suppose that one can exist.

9.    **"REASONABLE DOUBT"—"Doubt"—**Instructions. The expression "reasonable doubt" is its own best definition, and a "doubt" of the guilt of a defendant, honestly entertained, is a reasonable doubt.

*Appeal from District Court, Greer County;*
*G. A. Brown, Judge.*

W. H. Gransden was convicted of manslaughter in the first degree, and appeals. Affirmed.

The information charged the defendant with having, on the 2nd day of May, 1913, in Greer county, killed and murdered one J. K. Lytle, by shooting him with a pistol. Upon the trial of the case the defendant was convicted of manslaughter in the first degree, and was sentenced to be imprisoned in the penitentiary for the term of 10 years. The evidence shows: That the defendant owned and kept an automobile garage at Granite in Greer county. That the deceased lived on a farm near Brinkman, some 7 or 8 miles northwest of Granite, and owned two automobiles, one a large red car, and the other a small roadster. On the Monday morning prior to his death the deceased had brought the large car to the defendant's garage for repairs; the cam shaft being broken, which necessitated the sending of the shaft out of town for the proper welding. It was sent out on Monday, and was received back on Thursday at about noon. On Friday morning the deceased and his son Roy came to Granite in the roadster and spent the day, until about 4 o'clock in the afternoon, assisting in the repair work on the large car; the deceased being anxious to have it ready for use on the following day. At that time the deceased and his son Roy returned to the farm in the roadster. After supper the deceased and his two sons motored back to

Granite in order to get the large car, arriving there about 7 o'clock. McClannahan was still working on the repairs, and continued to do so until after 9 o'clock, receiving assistance from the deceased, his two sons, and the defendant.

No unpleasantness had been manifested during the day between the deceased and the defendant, but that evening a difficulty arose. The defendant wanted to take the magneto of the car under repair apart; the deceased insisting that he should not do so, as the instructions he said from the manufacturers forbid this as a condition precedent of their guaranty of proper service. About half past 9 o'clock it was discovered that McClannahan had for the second time placed the cam shaft wrong in the machine, requiring it to be again taken from the machine for proper revisement and requiring considerable time. The defendant ordered that work cease for the night, and that the garage be closed. To this the deceased objected, insisting that the repairs must be finished that night, saying that the machine had already been detained too long. This brought on the altercation which resulted in the tragedy. Aside from the defendant and the deceased, the only eyewitnesses to the tragedy were Roy Lytle, age 18 years, Barney Lytle, age 16 years, sons of the deceased, and John McClannahan and James F. Brown, employes of the defendant, who worked in his garage. The testimony of these 4 eyewitnesses as to the circumstances attending the shooting is substantially the same, allowing for difference in their relative positions and their natural feeling and relations towards the deceased and the defendant.

Roy Lytle testified: That the first trouble occurred that evening over the magneto, about 10 minutes before the shooting, and the defendant left the garage, saying that he was going to supper. When he returned he said he was going to close the garage, and his father said, "It will cost you $5 a day for every day" his car was in there. The defendant said, "You can just charge; I am going to close up." That his father struck the defendant on the right cheek with his left hand, and the defendant stepped back and drew a pistol; his father, walking toward the

defendant, told him to shoot; the defendant presented the pistol and pulled the trigger; it snapped; his father, saying, "Don't shoot!" turned and ran out on the sidewalk and turned north. The defendant followed him out and shot him in the back; his father fell and said, "Don't shoot me any more, John; that is enough; get a doctor quick." That those were his last words. That he stooped to pick up his father, and the defendant said, "If you touch him I will shoot a hole through you." That his father was in his shirt sleeves, and was unarmed, and did not have a pistol about his person. That their little car stood in the street south from the door of the garage.

The testimony of Barney Lytle was substantially the same as that of his brother Roy.

John McClannahan testified that he worked for the defendant; that he went home that evening about 7 o'clock, to tell his wife that he would be working late at the shop that night; that they were all working on the car, and the defendant took witness' car and left, saying he was going to supper; that when he came back he ran the car into the garage; the deceased at the time was talking to Jimmie Brown; that there has been no trouble up to that time; that shortly after he heard the deceased call the defendant a blue-bellied Yankee, and he heard a lick, and he got up from the car where he was working, and saw the defendant pull a gun, and the deceased ran out on the street, pursued by the defendant; that he heard a shot, he went out, and the deceased was lying on the sidewalk, 6 or 7 feet from the doorway. On cross examination he was asked if he heard the deceased use the term "son of a bitch" that evening; he said he did not.

Abe Hackett testified that he heard the shot and ran to the garage, reaching there about a minute later; the deceased was lying on the sidewalk, and the defendant said, "That is the notorious Jeff Lytle, that has been running the shops up here, and I beat him to it;" that the deceased was then living, but died in a few minutes.

G. B. Patterson testified that he was standing on the sidewalk on Main street near the garage, and saw the deceased come out of the building; that he was stooping forward and came out pretty fast; that he was about 10 feet from him, and a man named Ryan told him to leave, and as he was leaving he heard a shot, and looked and saw the deceased fall forward on his face; that he was then about 15 feet from the deceased.

Dr. Nunnery testified that he was called, and reached the deceased about the time he died; that his death was caused by a gun-shot wound; that the bullet entered the back between the two shoulder blades, and, passing upward, lodged in the neck, under the left ear.

For the defendant:

Joe Flynn testified that he was in the garage that evening about 8 o'clock, fixing and cleaning up his car; that he heard the deceased say, "Your hide will not hold shot;" that he walked up and said to them, "Don't have no trouble in here;" that the deceased picked up the magneto and said to witness, "It came in there running all right, and if they would let it alone it would run all right when they went out;" that Mr. Janeway instructed him not to "let anybody monkey with the magneto, only to send it back to the factory." He was then asked to state some of the things that the deceased said, and answered that he heard the expression, "God damn you, don't go into that magneto;" that he could not be positive as to whether the deceased used the term "son of a bitch;" that the defendant said, "Well, Jeff, I was going to see what way that magneto rotated, so I could use the car;" that the defendant then took his car and left, and witness took his own car and left.

J. F. Brown testified that he worked for the defendant by staying at his garage nights: that he was there that night when the defendant went to supper, and while the defendant was gone the deceased said to him "that he wouldn't work for such a man; that he was too low down and no account for a man like me to work for, and he wouldn't do it;" and witness told him that he

was staying there, that the defendant had hired him, and he had to do as he told him; that when the defendant came back the deceased commenced to argue with him, and called him a son of a bitch, and slapped the defendant in the face with his hand, and then they stepped apart, and the defendant pulled his pistol and snapped it, and the deceased ran out the door, and the defendant followed him with the gun, and he heard the shot.

Jasper Mesmore testified that he was a justice of the peace at the town of Granite; that he went to where the shooting accurred, and searched the roadster car standing in front of the garage, and found a 45 caliber Colt six-shooter, with all the chambers but one loaded.

John W. Baker testified that the deceased told him that evening that he would kill the defendant unless the latter got his car out by 10 o'clock. It is not shown that this statement was communicated to the defendant prior to the shooting. On cross examination of this witness it was proved that he had been twice convicted of bootlegging; that he told Doc Holley, who was the first person to inform him of the killing, that he was surprised that there was any trouble at all between them, and admitted to having a conversation with G. W. Baker about the killing the morning after it occurred, in which witness said to Mr. Baker that this was one case he would not be a witness in, "as he did not know a damn thing about it." He also admitted that the defendant had advanced money for his expenses to come from Texas to testify.

As a witness in his own behalf the defendant testified that on Thursday before the killing the deceased told him that "he used to be a pretty bad man around here;" that when McClannahan was at supper that evening the deceased said to him, "God damn you, don't you touch that magneto; if you touch that magneto, I will fill your hide so full of holes that it won't hold shucks; now, God damn you, that car came in here running; if you don't get it out of here running I am going to kill you;" and that he called the defendant a "God damned blue-bellied son of a

bitch." He further testified that about 9 o'clock he went home to supper; that, apprehending trouble with the deceased, he put his pistol in his pocket, and returned to the garage, and found that McClannahan had put the shaft in wrong the second time, and, as it would be impossible to again remove and replace the shaft within reasonable hours, he directed the garage to be closed for the night. The deceased said, "What is the matter, can't you get it out?" and he informed him that it was impossible to get the car ready that night; that the deceased advanced on him, inviting him to hit him, carrying his right hand in his hip pocket, and finally the deceased with his left hand slapped him on the right jaw, and then jumped back a few steps and put his hand in his hip pocket; then he pulled his pistol out, intending to shoot the deceased in the arm, but the pistol snapped, and the deceased said, "It won't shoot;" and he said, "Yes it will;" that after the gun snapped he threw the cartridge out and said to the deceased, "Take your hand off that gun, or I will kill you;" that the deceased seemed to be tugging away at the thing whatever it was, in his hip pocket, but could not get it out, and ducked around the corner of the big door, and he followed him out with his gun in his hand, and the deceased tried to get around the brick pillar; that just as he got around the pillar the deceased got his gun loose, and witness shot him; that he tried to hit him in the shoulder, and the deceased dropped to the ground on his hands; that his son Roy ran up and took the gun from his father and placed it in the small car standing in the street in front of the garage.

The defendant also offered as a witness W. C. Johnson, the deputy sheriff, who arrested him for the purpose of showing by such witness, as a part of the *res gestae*, that the defendant had said when arrested that Roy Lytle, son of the deceased, had approached his father's body and removed therefrom a pistol, and had secreted the same in the Lytle roadster standing in front of the garage. This testimony was excluded from the jury by the court, upon objections by the state that the same was merely a self-serving declaration, and not part of the *res gestate;* it being

in evidence that the defendant was not arrested until about 10 minutes after the shooting.

In rebuttal 6 or 7 witnesses qualified as character witnesses, and testified that the general reputation of the deceased as a peaceable, law-abiding citizen in that community was good.

*B. L. Tisinger,* of Mangum, and *B. F. Van Dyke,* of Granite, for plaintiff in error.

*Chas. West,* Atty. Gen., and *Chas. L. Moore,* Asst. Atty. Gen., for the State.

DOYLE, P. J. (after stating the facts as above). Plaintiff in error, W. H. Gransden, was tried for the murder of J. K. Lytle. The jury returned a verdict finding him guilty of manslaughter in the first degree, leaving his punishment to be fixed by the court. On the 2nd day of August, 1913, the court rendered judgment, and he was sentenced to be imprisoned in the penitentiary for the term of 10 years.

The first and second assignments of error are the usual ones: That the verdict was contrary to law and to the evidence, and that the court erred in overruling the motion for a new trial. The third assignment is:

"The court erred in not permitting to go to the jury the testimony of W. C. Johnson, a witness for the defendant, to the effect that when he placed the defendant under arrest, about 10 minutes after the homicide, that the defendant told him that he would find the pistol of the deceased in the little car of the deceased, where it had been placed by one of the boys of the deceased, the same being a part of the *res gestae;* and also corroboration of the evidence of the defendant, and of the witness of the defendant, Jasper Mesmore, who testified that he found the pistol under the seat of the little car."

(1) We think the court properly rejected the testimony of the witness Johnson on the ground that the declarations of the defendant at the time were self-serving and incompetent for any purpose.

It appears from the record that before the arrival of Johnson, and after the death of his victim, he made several statements to others, and several witnesses testified that the defendant was calm at the time of their arrival on the scene prior to the arrival of Johnson. There is nothing remarkable that the defendant should have known that there was a gun in the Lytle car; he had probably seen it, as the car had been in front of his place of business nearly the whole day. It is more remarkable that if the deceased had had a Colt's 45 caliber pistol in his hip pocket, and being in his shirt sleeves, that the defendant or his employes who were working with the deceased on the car would not have noticed it before the shooting. On the undisputed facts the defendant's statements to the witness Johnson formed no part of the *res gestae.* The testimony offered was therefore not admissible. See *Birdwell* v. *United States,* 10th Okla. Cr. 159, 135 Pac. 445.

(2) The defendant requested two instructions, which the court refused to give, and allowed exceptions. The court, among other instructions, gave the following, to which exceptions were taken:

"11. A person who is unlawfully attacked by another is not bound to retreat in order to avoid the necessity of injuring his assailant, or of killing him, if it reasonably appears to him to be necessary in order to save his own life, or to avoid serious bodily injury by the person killed; and the person so unlawfully attacked has the right to stand his ground and use such force as reasonably appears to him necessary to repel the attack upon him, and if the person making such attack is killed under such circumstances, the killing will be justifiable in self-defense; and it is not necessary to the right of self-defense that the danger should in fact exist; and if it reasonably appears to the defendant from all the facts and circumstances in the case that danger exists, he has the same right to defend against it and to the same extent that he would have were the danger real.

"12. When an unlawful attack has been made upon a person by another, and the person making the attack is killed, in determining whether the killing was necessary and in self-defense, the nature and apparent purpose of the attack, the intention with which it is made, the existence or appearance of danger, and the extent thereof, the amount or degree of force necessary and

sufficient to be used to avoid the apparent or threatened danger, and all the facts and circumstances in the case must be viewed and considered by the jury from the standpoint of the person doing the killing at the time thereof, and from no other standpoint, and if, when viewed from his standpoint, it appears that he might reasonably have believed the killing, or the act which resulted in death, was necessary to prevent death or great bodily harm to himself, the killing will be justifiable.

"13. But you are further instructed that while one unlawfully attacked has the right to use such force as under the circumstances reasonably appears to him necessary and sufficient to repel the attack and avoid injury to himself, he will not be justified in using greater force than so reasonably appears to him necessary and sufficient to avoid the danger apparently intended to be inflicted upon him, and if he uses greater force than so reasonably appears necessary to avoid death or great bodily injury to himself, and thereby kills the person who made the attack, or if the killing is committed after it reasonably appears to him that the person who made the attack has abandoned the same, and that danger to himself no longer exists, then the killing will not be justifiable, and the person who did it will be guilty of manslaughter in the first degree.

"14. You are instructed that insulting and abusive language will not justify or excuse homicide.

"15. You are further instructed that homicide cannot be justified or excused on the ground that the person killed, prior to the killing, had committed a mere assault and battery upon the person who did the killing, but when, at the time of the killing or just prior thereto, the person killed committed an assault and battery upon the person who did the killing, this may be taken into consideration by the jury in determining whether it reasonably appeared to the person who did the killing that he was at the time in danger of death or great bodily injury at the hands of the deceased.

"19. If you find and believe from the evidence beyond a reasonable doubt that the defendant is guilty of murder or of manslaughter in the first degree, but you have a reasonable doubt as to which of said offenses he is guilty, you must give him the benefit of the doubt and find him guilty of the latter offense, to-wit, manslaughter in the first degree.

"21. The defendant, while testifying as a witness in his own behalf, admitted that he shot and killed J. K. Lytle at the time and

place alleged in the information, and claims that such killing was in his own self-defense. And in this connection you are instructed that if at the time of, or immediately before, the killing, the deceased made an attack upon him with a pistol, and that from the manner and nature of such attack, and from all the facts and circumstances in the case, it reasonably appeared to the defendant that the deceased then and there intended to shoot and kill, or seriously injure him, the defendant, and he shot the deceased, believing at the time he did so it was necessary to avoid such apparent or threatened injury to himself, then you will find him not guilty and so say by your verdict, and unless you find from the evidence beyond a reasonable doubt that the killing was not done under the circumstances herein just stated, you must acquit the defendant.

"24. The defendant in a criminal case is not required by law to prove his innocence, but the burden is upon the state to prove his guilt of the offense charged against him. He is presumed to be innocent of such charge until his guilt thereof is established by the evidence beyond a reasonable doubt, and in case the jury, after a careful consideration of all of the evidence in the case, have a reasonable doubt as to the defendant's guilt, they must acquit him and return a verdict of not guilty.

"25. The jury are instructed that a reasonable doubt is a doubt for which there exists a reason in the minds of the jurors, founded upon the facts and circumstances in proof in the case, and is a state of mind of which an ordinarily intelligent man could readily give an explanation, consistent with the facts disclosed by the evidence, and the law as given to the jury by the court."

It is contended that the court improperly instructed the jury on the law of self-defense; that instruction No. 11 is prejudicial, "In that it impresses upon the minds of the jury that the defendant would have the right to simply stand his ground," and that it should have included the concluding paragraph of the defendant's requested instruction No. 2, which is as follows:

"And in such case the defendant was not compelled to retreat, but had the right to pursue his adversary until he found himself out of danger, and if in the conflict between them, under the circumstances described, the defendant killed the deceased, such killing is justifiable."

We think instructions No. 11 and No. 12 sufficiently covered the law of self-defense under the facts and circumstances appearing in evidence in this case, and that the instruction requested was properly refused. There was no evidence tending to prove that after the deceased turned and fled from the defendant endeavoring to make his escape, that the defendant was at any time in danger of bodily harm, or had any reason to apprehend such danger.

(5) To repel a simple assault the person assaulted is not authorized to attack his assailant with a deadly weapon. He will not be justified in doing those acts that are calculated to destroy the life of his assailant, unless the assault is of such a character as to endanger his life or inflict on him great bodily injury, or to excite his fears as a reasonable man that such would be the result of the assault. If his assailant retreats in good faith, and there are no reasonable grounds for apprehending danger from him, the pursuit of him is not justifiable, and if under such circumstances he is pursued and killed, the killing cannot be justified on the ground of self-defense. Michie on Homicide, 423. The law limits him to such acts as are necessary or apparently necessary to self-defense.

In support of the other exceptions taken to the court's instructions, counsel complain that they are insufficient in that:

"There is not included therein or elsewhere in said instructions, any instructions to the jury as to what consideration to give insulting and abusive language as used by the deceased toward the defendant just prior to the homicide."

Under any circumstances passion caused by mere words cannot reduce homicide below the crime of manslaughter in the first degree. The defendant can only complain of errors which may have affected his rights.

In support of other exceptions taken counsel complain that the instructions given do not cover the law of communicated and uncommunicated threats previously made by the deceased against the defendant as tending to show the feeling of the deceased toward the defendant. It appears from the record no such instruc-

tions were requested by the defendant. We think the instructions as given by the court were sufficiently broad and comprehensive as to fairly cover these points. The defendant having failed to request more specific instructions on these points, waived the same, and therefore the omission to give such instructions was not error.

(4) Finally it is insisted that the court erred in giving instruction No. 25, defining "reasonable doubt." By numerous decisions of this court it has been held that an instruction which states that by the term "reasonable doubt" is meant a doubt for which a reason may be given, is erroneous. *Harris* v. *State,* 10th Okla. Cr. 417, 137 Pac. 365, 139 Pac. 846; *Morgan* v. *State,* 7th Okla. Cr. 45, 121 Pac. 1088; *Abbott* v. *Territory,* 1st Okla. Cr. 1, 94 Pac. 179, 16 L. R. A. (N. S.) 260, 129 Am. St. Rep. 818.

(6) While we do not hesitate to condemn this instruction, still we do not think it constitutes reversible error in this case, because the guilt of the defendant was so clear and palpable from the evidence that no question of doubt could arise. It may be safely said that with this exception the instructions given were far too favorable for the defendant. Our Procedure Criminal provides that:

"Upon a trial for murder, the commission of the homicide by the defendant being proven, the burden of proving circumstances of mitigation, or that justify or excuse it, devolves upon him, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable." Section 5902, Rev. Laws.

See *Boswell* v. *State,* 8th Okla. Cr. 152, 126 Pac. 826; *Lumpkin* v. *State,* 5th Okla. Cr. 488, 115 Pac. 478; *Culpepper* v. *United States,* 4th Okla. Cr. 103, 111 Pac. 679, 31 L. R. A. (N. S.) 1166, 140 Am. St. Rep. 668.

(3) This court has often held that when the instructions fully and fairly covered the law of the case when taken and considered together, though one of them may be erroneous, still

for such error the judgment will not be reversed, provided it shall appear that no prejudice has resulted by reason of such erroneous instruction.

(9)  In *Nelson* v. *State,* 5th Okla. Cr. 369, 114 Pac. 1124, it is said that:

"An instruction defining reasonable doubt should not be given by the trial courts of this state, except upon proper request by defendant."

We do not think that the term "reasonable doubt" is of such unknown, uncertain, or uncommon signification that a definition by the court in its charge to the jury is called for. Language that is within the comprehension of persons of ordinary intelligence can seldom be made plainer by further definition. It has been said that, "the expression itself seems to comprehend the whole subject-matter, 'reasonable doubt,'" and that the phrase is its own best definition, and any attempt to define the phrase is likely to leave in the minds of the jury, "a reasonable doubt as to what a reasonable doubt is." Jurors are presumed to have common sense, and to understand common English, and all persons who possess the qualifications of jurors know that a "doubt" of the guilt of the defendant, honestly entertained, is a reasonable doubt.

Having considered the errors assigned, we should add in conclusion that upon the whole record we are satisfied that no exception taken by the defendant upon the trial is of any force, although it appears that the defendant was there, as he has been here on the appeal, exceptionally well represented.

The conviction meets with our approval, and, finding no material error in the record, the judgment rendered upon the verdict is affirmed.

FURMAN and ARMSTRONG, JJ., concur.


ON REHEARING.

*B. L. Tisinger,* of Mangum, *B. F. Van Dyke,* of Granite, and *H. H. Hagan,* of Oklahoma City, for appellant.

*R. McMillan,* Asst. Atty. Gen., and *A. R. Garrett,* Co. Atty., of Mangum, for the State.

BRETT, J. This case comes up on petition for rehearing. There is one proposition raised by the petition for rehearing which deserves, and has received, our most careful consideration. This is the failure of the court to instruct the jury specifically, upon the defendant's theory as to why he shot his fleeing adversary in the back.

(7) The difficulty which resulted in the shooting occurred in a building which faces west. Four feet in front of this building were two brick pillars, which supported a protruding roof. These pillars were each 17 inches square and located one to the north and the other to the south of the front door. The defendant testified: That when the difficulty arose the deceased advanced upon him and slapped him on the face with his left hand, and was at the same time tugging a pistol in the right hip pocket with his right hand. That he stepped back and drew his pistol and snapped it at deceased. That deceased then hastily retreated, going out the front door and toward the north pillar in front of the building, still tugging at his pistol with his right hand, trying to get it out of his right hip pocket. That he believed deceased was retreating for the purpose of taking shelter behind the brick pillar, and intended to shoot at him from that place of vantage. That he stepped out upon the sidewalk to the southwest of the front door, and before deceased had reached the pillar he saw the handle of his pistol, and instantly fired the fatal shot, believing it was necessary to do so to protect his own life. The fatal bullet struck the deceased in the back, about midway between the shoulder blades, and he instantly fell to the pavement.

The defendant requested the court to instruct the jury as follows:

"If the jury believe that the deceased at the time of the homicide intended and endeavored to take the life of the defendant, or do him serious bodily harm, or that the defendant, from all of the evidence and all the facts and circumstances surrounding him at

the time, viewed from his standpoint, had reasonable ground to believe that his life was in imminent danger from the deceased, or that the deceased intended and was attempting to do him serious bodily harm, the defendant was justifiable in shooting the deceased to repel the attack. And in such case the defendant was not compelled to retreat, but had the right to pursue his adversary until he found himself out of danger, and if in the conflict between them, under the circumstances described, the defendant killed the deceased, such killing is justifiable."

This requested instruction was refused; and the defendant insists that he was entitled, under his own evidence, to this instruction or a similar one, which would tell the jury that if they believed that the defendant thought the deceased was retreating to take cover behind this brick pillar, and from that vantage ground shoot him, that he was justified in pursuing him and shooting him to prevent such action on the part of deceased. This proposition was very skillfully and ably argued by counsel for defendant, in an oral argument on the petition for rehearing; and we were strongly impressed that it might not be without merit. But a careful examination of the record shows that the unimpeachable physical facts so squarely contradict the testimony of defendant that the court was justified in refusing to give this instruction.

The evidence shows that the deceased passed out the front door, and went between the wall and the brick pillar to the north of the door, and was shot down northwest of this pillar. He had passed between the wall and this pillar, which .necessitated his ·going on the east side of the pillar, and as he emerged from the northwest side of the pillar, and was going north, with his back toward defendant, defendant fired the fatal shot. If the defendant surmised in the first instance that it was the purpose of deceased to take shelter behind this pillar as a vantage ground, that supposition vanished, or would have vanished in the mind of a reasonable man, when he saw the deceased pass by this pillar and emerge to the northwest of it, still retreating, with his back toward him.

Besides, it developed in the evidence, and stands undisputed, that the deceased was left-handed. And it is a matter of common knowledge that a left-handed man would carry his gun in a

left-hand pocket, accessible to the dextrous hand, and would use that hand in drawing his gun, and when engaged in a deadly combat. There were others who saw deceased strike defendant with his left hand, but none of them saw him tugging at a pistol with his right hand; and that he would be doing this, under the undisputed evidence that he was a left-handed man, is contrary to the common experience of men. No pistol was found upon the body of deceased; and the attempted explanation of defendant that the son of deceased took a pistol from his hand is absurd, since all the witnesses, including the defendant himself, testified that, the instant deceased fell, defendant covered the son with his revolver, and refused to allow him to administer to or touch the body of his dying father. And we believe the doctrine to be sound that when the unimpeachable physical facts squarely contradict the words of the defendant on the witness stand, and show the theory of his testimony to be absurd, that "courts are not required to ignore such physical facts and give instructions not in harmony with them," but absolutely subversive of the theory they mutely and unalterably declare. *State* v. *Gilmore,* 95 Mo. 554, 8 S. W. 359, 912.

(8) A court by its instructions is not required to invite a doubt, where nothing can be so unreasonable as to suppose that one can exist. A court is not required to stultify itself by basing its instructions upon the defendant's words in preference to his acts. "The latter are the true exponents of his intention, and they furnish the only safe key to his motives." *State* v. *Bryant,* 102 Mo. 24, 14 S. W. 822; *State* v. *Turlington,* 102 Mo. 642, 15 S. W. 141; *State* v. *Anderson,* 89 Mo. 312, 1 S. W. 135. And in the language of the court in *State* v. *Tucker,* 232 Mo. 1, 133 S. W. 27:

"It seems to us that this is, if there ever was, a case in which a court and jury could say that the statements of the defendant so contradict the physical facts, and his conduct is so unreasonable and inconsistent with the experience of mankind, that the court was not bound to believe him and instruct the jury on his testimony."

And yet the court in this case, out of an abundance of fairness and precaution, instructed the jury that:

"When an unlawful attack has been made upon a person by another, and the person making the attack is killed, in determining whether the killing was necessary and in self-defense, the nature and apparent purpose of the attack, the intention with which it is made, the existence of appearance of danger, and the extent thereof, the amount or degree of force necessary and sufficient to be used to avoid the apparent or threatened danger, and all the facts and circumstances in the case must be viewed and considered by the jury from the standpoint of the person doing the killing at the time thereof, and from no other standpoint, and if, when viewed from his standpoint, it appears that he might reasonably have believed the killing, or the act which resulted in death, was necessary to prevent death or great bodily harm to himself, the killing will be justifiable."

Under the facts in this case we do not believe that the defendant was entitled to more. The defendant bases his right to the special instruction requested on the doctrine of this court as announced in former cases, and cites *Courtney* v. *State,* 10th Okla. Cr. 589, 140 Pac. 163; *McIntosh* v. *State,* 8th Okla. Cr. 469, 128 Pac. 735; *Payton* v. *State,* 4th Okla. Cr. 316, 111 Pac. 666, and *Douglas* v. *Territory,* 1st Okla. Cr. 584, 98 Pac. 1023. But the doctrine above announced is not in conflict with the holding in the above-cited opinions. In *Courtney* v. *State, supra,* the holding is that:

"The accused, in a criminal case, is entitled to instructions defining the law applicable to his theory and covering his defense, if there is competent evidence tending reasonably to substantiate such theory."

And this is in substance the holding of each of the above cases cited, and is sound, and is in no way in conflict with what is said in this opinion.

The petition for rehearing is denied.

DOYLE, P. J., and ARMSTRONG, J., concur.