## JOHN H. GRAY v. STATE.

No. A-8689.   Oct. 12, 1934.
Rehearing Denied Dec. 7, 1934.
(38 Pac. [2d] 967.)

King & Crawford and J. W. Bolen, for plaintiff in error.

J. Berry King, Atty. Gen., and Smith C. Matson, Asst. Atty. Gen., for the State.

DAVENPORT, J.   The plaintiff in error, hereinafter referred to as the defendant, was by information charged with the crime of murder; was tried and convicted of manslaughter, and sentenced to serve a term of 16 years in the state penitentiary.

The testimony on behalf of the state shows the defendant lived in Pontotoc county, near Steedman, Okla.; that the deceased, Charley Long, was a share cropper with the defendant; on the 7th da yof July, 1933, the defendant with other parties went to the city of Ada, Okla., and while there procured some whisky, and on their way home bought a quart of whisky; the parties took one or more drinks of this whisky, and when they reached defendant's home they had something like a pint left; Bill Hopkins and defendant, when they returned from Ada, sat down on the porch in front of the defendant's house and drank some more of the whisky; shortly after the parties returned from Ada, the deceased, who had been plowing near the defendant's house, quit plowing and came to the house to do the chores before night; when he passed where the defendant and Bill Hopkins were sitting, they asked him to take a drink of whisky and he did so and passed on toward the barn; later he came back and got the milk bucket

and was gone a short while and came back and set the bucket down. The trouble arose over some papers to be turned in to the federal government with reference to plowing up a cotton crop on the farm in which the defendant and deceased were interested.

As shown by the proof the deceased claimed he asked the defendant to sign the papers, and that the defendant did not sign them in the proper places and as many times as was intended they should be signed. Witness Hopkins states deceased told the defendant he asked him to sign the cotton papers in three places, and the defendant called the deceased a "God damned liar," and deceased reached down and picked up a rock, and says: "Don't call me a God damn liar, I will knock your God damned brains out." At this time the witness Hopkins states the defendant was sitting in a chair on the porch.

The deceased still held the rock in his hand, and told the defendant he would go in the house and get the God damned papers and burn them; deceased then walked into the middle room of the house, got the papers, and stepped off the porch into the yard; when he had gotten about four or five feet off the porch, the defendant got up and walked around and entered the middle room of his house; at this time the deceased turned and started to face toward the east; Hopkins states he could not see the defendant at the time, but did see about six or eight inches of a gun barrel sticking out of the door; that deceased whirled around throwing his right side to the door, and about that time the gun fired. Witness thought the shot hit the deceased in the right side; the deceased threw up his hands and then went to sinking down; after which the defendant got closer to the door and fired the second shot; the body of the deceased then flattened out on the porch; his head

went off the north end of the porch with his head and shoulders almost against the house. Witness at that time did not know where the wife of the defendant Gray was; the defendant came out without the gun and stepped into the yard; at the time deceased Charley Long was shot, the witness says the rock was in his hand; that the deceased did not at any time attempt to attack the defendant with the rock; witness stated he was within about eight feet of where the shooting took place. After the shooting defendant came out in the yard and asked the witness to come to him, taking the witness into the log room that stood south from the other room and a little bit east; witness then stated:

"I asked Mr. Gray what he did that for and he stated, 'You don't know all, I know. I have been wanting to do this a long time.' The defendant then said, 'I am going to Charley's house, you stay here until I get back, if you don't, God damn you, I will kill you.' I told him to shoot, I was going to Charley Brooks."

Witness never saw the defendant from that time until the preliminary trial.

The testimony shows that Bill Hopkins was the only eyewitness to the trouble between the deceased and the defendant, unless defendant's wife was in one of the rooms of the house where she could have seen what took place. She was not called as a witness; therefore the only eyewitness testifying was Bill Hopkins.

The state called the funeral director, Wyley Keith, who stated there were two wounds on the body of the deceased, one on the right side about the third rib, and the other on the back; either of the wounds would have been fatal. The wounds seemed to have been inflicted by a shot gun.

212

The state also called Dr. I. L. Cummings, who testified to the location of the wounds, and that either would be fatal. Further testimony was offered by the state as to the location of the house, porch and barn.

The defendant, testifying in his own behalf, stated he came to Oklahoma from North Arkansas; admitted the killing of Charley Long at his home in Pontotoc county on the 7th day of July, 1933. The defendant further stated the deceased was living at his home and making a share crop. He also gave some testimony as to what he heard about the deceased being quarrelsome and having had trouble with other parties. With reference to the killing he stated when he and Bill Hopkins returned from Ada and sat down on the porch of his home, they had about a pint of whisky:

"Charley was plowing over east about 150 yards, maybe 200; in ten or fifteen minutes Charley came along going south; Bill Hopkins asked him, 'Don't you want a drink of whisky?' and he said, 'I believe I do.' He took a drink and it looked like he drank about half of what was in the jar, something like a half pint, and went on I suppose to put up his mules; he came back and asked me, 'Why don't you sign them papers?' And I said, 'Charley, I did sign them papers, where that little dash was on the paper and got Francis Johnson to witness it.' He said, 'You are a damned liar, you didn't. I will get the damned papers and burn them up,' and he went in the house. I did not see him get the papers but he came out with some in his hand and went to milk the cows; when he returned he set the milk bucket down by the well and stepped back and says: 'God damn you, you know you did not sign them papers like I told you.' I said I signed them papers like he told me, and he said, 'You are a God damn liar,' and jerked up a rock and says, 'I will knock your God damn brains out.'

"When he did that he started around the well; I got my gun and when he was coming on the porch with the rock I was coming toward the door with the gun, and I was, the best I remember, about seven or eight feet of the door when he was just outside the door; I says, 'Charley, if you don't stop, I will kill you,' and he did not stop and I shot two shots just as fast as I could fire them; that is all I know about it; he had a big rock in his hand; the rock looked bigger than this rock, but it looked something like that size; I thought he was going to kill me; the gun was in the room in a rack on the wall just above Charley's trunk. Charley had left his trunk in the room; he slept there during the winter. Me and my wife had not had any trouble about these papers; I wanted to sign the papers, I needed the money; my wife had read them over to me twice the night before; I signed them in one place and had Francis Johnson to witness the signature; my eyes got so I could not see to read; I have been afflicted for about sixteen years with neuritis; Charley Long is about forty-two years old, and weighs about 160 to 165 pounds; I weigh 145 to 150. He was very quick and strong physically.

"After I shot the deceased, I said to Bill Hopkins, 'You take that chair and don't let anybody move him until the officers get here'; I did not make the statement to Hopkins that he did not know all I knew, that I had been wanting to kill Charley Long for a long time; I have never had any reason to want to kill him; we had had no trouble; I did not tell Bill Hopkins if he did not stay there I would kill him; I came on to Ada that night. I think I told Mr. Hubert Bryson that he did not need to know how the trouble occurred."

On cross-examination many questions were propounded to the defendant with reference to trouble he might have had in Arkansas, and other places, all of which was immaterial to the issue being tried, and should not have been asked, they were on immaterial points, and counsel for the state, even though he was cross-examining

the defendant, went far afield in asking improper, irrelevant, and immaterial questions concerning the past life of the defendant.

The defendant, to reverse the judgment, has assigned nine errors alleged to have been committed by the trial court. In his brief the first error argued and urged by the defendant is:

"Because the court erred in giving the following instructions to the jury: Numbers 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, and 39, to which the plaintiff in error duly excepted."

Number 16 of the state's instructions complained of by the plaintiff in error, and argued in his brief, is as follows:

"While a person need not be in actual, imminent peril of his life being taken, or of great 'personal injury being done him, yet, if the jury believed that the defendant had reasonable ground to believe and did believe from the facts as they reasonably appeared to him at the time that the danger was so urgent and pressing, or apparently so urgent and pressing, that the defendant could not avoid the necessity of killing in safety to himself, to protect himself from death or great personal injury, then if under such circumstances the killing took place, it was justifiable."

The defendant insists that instruction 16 shifts the burden of proof from the state to the plaintiff in error, arguing at length that the court in this instruction tells the jury that if the defendant had reasonable grounds to believe and did believe that danger was urgent and pressing, he had the right to act. It is urged by the defendant that this instruction was misleading and prejudicial to his rights for the reason that under that part of instruction 16 complained of by the defendant the jury could have a reasonable doubt, but it would avail him nothing.

An instruction in the exact language of instruction 16, complained of by the defendant in this case, was approved by this court in the case of Brantley v. State, 15 Okla. Cr. 6, 175 Pac. 51. The language of this instruction is one that has been approved by this court and almost universally followed by the trial courts in instructing upon the law of self-defense. We do not think the instruction tends to place any undue burden upon the defendant, and is not erroneous. It is a clear statement of the law that has been followed by this court in many opinions.

It is next urged by the defendant that the court erred in its instruction No. 27, which instruction is as follows:

"Some evidence has been introduced in this case tending to show that the general reputation of the defendant in the community in which he lived was that of a quiet, peaceable citizen, and the court instructs you that if you find and believe from the evidence that prior to the alleged offense for which the defendant is now on trial his general reputation in the community in which he lived was that of a peaceable citizen, then you should consider that fact and give it such weight as you deem proper in determining the question of the defendant's guilt or innocence of the charge against him, and if, upon a careful consideration of all the evidence in the case, including that bearing upon the good reputation of the defendant, you nevertheless believe beyond a reasonable doubt that the defendant is guilty of either of the offenses above mentioned, then his previous good reputation will constitute no justification or defense."

The defendant in his brief argues that instruction 27 clearly puts the burden on the defendant to prove his good reputation when as a matter of law it is presumed, and refers to his argument in his brief as to instruction No. 16, being an improper instruction. Upon an examination of the record we find that the defendant put his reputation in issue by calling witnesses to testify as to his

previous good character. It is true, as argued by the defendant, that his reputation was presumed to be good until put in issue, and when put in issue the state would then have the right to offer testimony by calling witnesses for the purpose of controverting the question of the good reputation of the defendant for being a peaceable, law-abiding citizen. Similar instructions to the one given by the court in this case, of which the defendant complains, have been substantially approved by the territorial Supreme Court in the case of Wells v. Territory, 14 Okla. 438, 78 Pac. 124, and Wilson v. State, 3 Okla. Cr. 714, 109 Pac. 289.

In Carney v. State, 29 Okla. Cr. 83, 232 Pac. 451, 452, in the body of the opinion this court said:

"Evidence of previous good character of the defendant is admissible in his behalf upon the theory that, being of good character, it is improbable that he would have committed the offense with which he is charged; and it is for the jury to weigh and consider and give such effect as they think it entitled, in considering and determining whether the defendant is guilty of the offense with which he is charged. By numerous decisions of this court it is held that previous good character of a defendant is a fact that he is entitled to have submitted to the jury precisely as other circumstances favorable to him. Davidson v. State, 15 Okla. Cr. 85, 175 Pac. 120; Kirby v. State, 25 Okla. Cr. 330, 220 Pac. 74, 33 A. L. R. 1212."

In Coleman v. State, 6 Okla. Cr. 252, 118 Pac. 594, 598, this court said:

"If the jury believe from the evidence that prior to the occasion in question the defendant's reputation in the community in which he lived for truth and veracity was good, then the jury may consider that fact in determining the question of the defendant's guilt or innocence of this charge. But, if, upon a consideration of all the evidence in the case, you believe beyond a reasonable doubt

that the defendant is guilty as charged, then his previous good reputation would neither justify nor excuse the offense."

We hold that instruction 27, complained of by the defendant, is supported by the decisions not only of the territorial Supreme Court but also by this court. The court did not err in giving the instruction.

It is next contended that the court erred in giving instruction No. 34, and in support of his contention that instruction No. 34 is erroneous he cites the case of Patzwald v. U. S., 7 Okla. 232, 54 Pac. 458. The defendant contends that the court, in Patzwald v. U. S., supra, draws a distinction between an abiding faith and moral certainty, and that instruction 34 complained of is insufficient, for the reason that the court does not use the words, moral certainty.

Ballentine, in his Law Dictionary, page 4, defines "abiding faith" as "a belief or confidence in the guilt of one accused of crime which remains or continues in the minds of the jury."

Ballentine also, at page 831, defines "moral certainty," as follows:

"The phrase is one, the use of which is not likely to assist the jury in charging upon the question of reasonable doubt. It is an artificial form, the words having no precise and definite meaning. As explained in the Century Dictionary, it signifies a probability sufficiently strong to justify action upon it. In Webster's International, the first definition given is, 'a very high degree of probability, although not demonstrable, as a certainty.' It has also been used as indicating a conclusion of the mind established beyond a reasonable doubt."

Ballentine further, at page 1033, states:

"Proof to a moral certainty, the same as proof beyond a reasonable doubt, is a phrase synonymous and equiva-

lent to proof to a moral certainty, each signifying such proof as satisfies the judgment and conscience of the jury."

It will be seen from the quotations from Ballentine's Law Dictionary that the argument presented by the defendant as to instruction 34 complained of is without merit, as it is a phrase used as a synonym of the expression beyond a reasonable doubt. An instruction similar to the one here given was approved by the Supreme Court of the United States, in the case of Hopt v. Utah, 120 U. S. 430, 7 S. Ct. 614, 30 L. Ed. 708, in which case the court discussed at length the question raised in this case and stated:

"The difficulty with this instruction is that the words 'to a reasonable and moral certainty' add nothing to the words 'beyond a reasonable doubt;' one may require explanation as much as the other."

In Commonwealth v. Costley, 118 Mass. 1, the court held that the words of a reasonable and moral certainty add nothing to the words beyond a reasonable doubt:

"As applied to a judicial trial for crime, the two phrases are synonymous and equivalent; each has been used by eminent judges to explain the other; and each signifies such proof as satisfies the judgment and consciences of the jury, * * * that the crime charged had been committed by the defendant, and so satisfies them as to leave no other reasonable conclusion possible."

It was there also said that from the instruction to the jury they should also be satisfied of the guilt of the defendant beyond a reasonable doubt.

In Thompson v. State, 16 Okla. Cr. 716, 184 Pac. 467, in discussing the question of the trial court defining reasonable doubt, this court said:

"The trial court also, over the objection and exception of defendant's counsel, gave an instruction defining

the term 'reasonable doubt.' This court has repeatedly admonished trial courts against giving any instruction attempting to define the term 'reasonable doubt.' Grandsen v. State, 12 Okla. Cr. 417, 158 Pac. 157; Nelson v. State, 5 Okla. Cr. 369, 114 Pac. 1124."

In this case the court instructed the jury that the state must prove each and every material allegation in the information, and that the jury must be convinced beyond a reasonable doubt of the guilt of the defendant before it should return a verdict of guilty. When this instruction was given by the court to the jury, even though the defendant requested the court to define reasonable doubt, we hold that it was not necessary for the court to define what is meant by reasonable doubt.

The instruction is not prejudicially erroneous under the facts in the record. The jury could not have been misled by the language of the court in attempting to define "reasonable doubt," as the guilt or innocence was a simple issue under the facts.

It is further contended by the defendant that the trial court erred in overruling his motion for a new trial on the ground of newly discovered evidence. An examination of the defendant's motion for a new trial discloses that the only statement made in his motion for a new trial is that the evidence he desired to produce by the witnesses named in the motion for a new trial could not have been, by the exercise of due diligence, discovered in time for his trial. An examination of the affidavits attached to the motion for a new trial shows that they all relate to the question of the impeachment of the witness Bill Hopkins. The motion fails to show any diligence on the part of the defendant, or that any effort was made to procure the attendance of the witnesses named by whom the defendant claims he can show the reputation of Bill Hop-

kins for truth and veracity in Washita county was bad. Many of the witnesses reside in Washita county, and the record discloses that if the defendant could show by these witnesses who resided in Washita county that Hopkins' reputation was bad when he resided in Washita county, that the ecidence would be cumulative, as a number of witnesses from Washita county testified at the trial that the reputation of Bill Hopkins when he lived in Washita county for truth and veracity was bad, which evidence was not rebutted by the state.

The record discloses that at the time of this killing there was only the defendant, Bill Hopkins, and the wife of the defendant at the home; as to whether or not the wife saw the shooting the record is silent, so the only eyewitnesses testifying were Bill Hopkins for the state, and the defendant in his own behalf. The state could not call the wife of the defendant as a witness.

This court, in Ball v. State, 47 Okla. Cr. 145, 286 Pac. 808, in the third paragraph of the syllabus said:

"In a motion for a new trial upon the ground of newly discovered evidence, the diligence used in procuring testimony must be stated fully. It is not enough to merely allege that the defendant has used due diligence, but the facts constituting such diligence must be stated fully, so as to enable the court to determine whether or not proper diligence has been exercised."

In order to entitle the defendant to a new trial on the ground of newly discovered evidence, section 3120, O. S. 1931, must be complied with. The defendant did not make a sufficient showing to justify this court in holding that the trial court abused its discretion in overruling his motion for a new trial. It has been repeatedly held by this court that a motion for a new trial is addressed to the sound discretion of the trial court, and its actions will

not be disturbed unless a manifest abuse of discretion appears. Hill v. State, 19 Okla. Cr. 406, 200 Pac. 253; Ray v. State, 35 Okla. Cr. 322, 250 Pac. 438; McColloch v. State, 45 Okla. Cr. 442, 283 Pac. 1026.

The motion for a new trial is fatally defective because it does not state fully the circumstances to show that such evidence was newly discovered and could not have been discovered earlier by the exercise of due diligence. The defendant is required to set out in his motion facts showing that he used due diligence to procure the testimony. Johnson v. State, 21 Okla. Cr. 17, 204 Pac. 311; Devore v. State, 33 Okla. Cr. 403, 243 Pac. 999; Donahue v. State, 38 Okla. Cr. 87, 259 Pac. 179.

Upon the showing made by the defendant the court did not err in overruling his motion for a new trial.

Considering the instructions together, they correctly stated the law applicable to the facts. The defendant was accorded a fair and impartial trial. There are no errors in the record warranting a reversal.

This is a case where the facts are clearly disputed. The evidence given by the defendant is contradicted by the only eyewitness, Bill Hopkins. The record shows the wife of the defendant was at the house at the time of the killing but for some reason was not called as a witness by the defendant. The record shows the defendant is a man of 75 years of age. If his testimony was to be believed, when he fired the shots he believed he was in danger of receiving great bodily harm or losing his life at the hands of the deceased. If the testimony of the witness Hopkins is to be believed, the defendant shot the deceased without any justification. After considering the age of the defendant, the testimony of the state, which shows that the

222

deceased was going toward the door of the room in which the defendant was, with a rock in his hand, and circumstances surrounding the trouble, we believe the punishment imposed is excessive and should be modified from 16 years to 10 years, and as so modified the judgment is affirmed.

EDWARDS, P. J., and CHAPPELL, J., concur.